# GEORGE J. TURNER et al.

## vs.

# HOWARD S. SCHWARZ et al.

*Pledge of Stock—Repledge—Tortious Conversion—Attachment—Debt Fraudulently Incurred—Implied Contract.*

A pledgee of corporate stock who rehypothecates it to secure a personal loan to him for a sum greater than the amount for which it has pledged with him, and by so doing places the stock beyond his power to return it, or stock of the same kind, to the pledgor, upon his paying or offering to pay the indebtedness for which it is pledged, is guilty of a wrongful conversion.

p. 472

A printed memorandum upon the quarterly statements rendered by a firm of brokers to their customers, stating that "it is understood and agreed that all securities carried in this account or deposited to secure the same may be carried in our general loans," could not impair the effectiveness of a special written agreement with a particular customer, that the latter should have a right to the return of the securities pledged by him, or securities of like kind and amount, on the payment of his indebtedness.

pp. 473-475

That one, to whom securities are pledged to secure a loan of less than their value, wrongfully rehypothecates them, involves a conversion thereof, with the result that thereupon the pledgee ceases to be the pledgor's creditor and becomes his debtor, and the debt thus created is fraudulently incurred, within the meaning of the attachment law.

pp. 475, 476

While the debt or claim upon which an attachment will issue must arise out of a contract, it need not be an express contract, it being sufficient if the facts are such that an action of assumpsit would lie.

p. 476

The wrongful rehypothecation of corporate stock by the pledgees thereof, involving a conversion by them of the stock, as preventing their performance of their part of the contract of

pledge, gives rise to an implied contract, which will support an action for money had and received. pp. 477, 478

*Decided February 8th, 1922.*

Appeal from the Superior Court of Baltimore City (AMBLER, J.).

Action by George J. Turner and W. D. Nelson Thomas, trading as Turner & Thomas, against Howard S. Schwarz and Allen Schwarz, trading as William Schwarz & Sons. From an order granting a motion, by Harry N. Baetjer, trustee for creditors of said defendants, to quash a writ of attachment issued in behalf of plaintiffs, plaintiffs appeal. Reversed.

The cause was argued before BOYD, C. J., PATTISON, URNER, ADKINS, and OFFUTT, JJ.

*Charles Clagett,* with whom were *James Thomas* and *Clagett & Thomas* on the brief, for the appellants.

*Joseph France,* with whom were *Samuel K. Smith* and *Venable, Baetjer & Howard* on the brief, for the appellees.

PATTISON, J., delivered the opinion of the Court.

This appeal is from an order of the Superior Court of Baltimore City quashing an attachment on original process, instituted by the appellants against the appellees.

The appellants, George J. Turner and W. D. Nelson Thomas, partners trading as Turner & Thomas, in the months of February and March, 1913, purchased through the appellees, William Schwarz & Sons, stock brokers, one hundred and ninety-eight shares of the capital stock of The National Bank of Baltimore, at and for the sum of $180 per share.

The appellants, after making a partial payment thereon, gave to the appellees their six promissory notes for the balance of the purchase money, and, to secure the payment of said notes, they left on deposit with the appellees the certifi-

cates of the stock so purchased, properly endorsed for transfer.

The appellants from time to time made payments to the appellees upon the indebtedness created by the purchase of said stock, and at such times "withdrew shares of stock so held as collateral," when, on the 12th day of December, 1920, there remained owing thereon to the appellees the sum of $3,110.96, and, to secure the payment of this sum, there had been left with the appellees, as collateral, forty-three shares of said stock, its value then being $180 per share or $7,740 in the aggregate, thus making the value of the securities pledged for such balance $4,629.04 in excess of the debt then owing by the appellants to the appellees.

On the said 12th day of December, 1920, the appellants tendered to the appellees the balance of the indebtedness owing to them upon said purchase, and demanded the surrender of the forty-three shares of the stock held by the appellees as collateral; but this stock, with other securities, including the securities of other customers, had been rehypothecated by the appellees with certain financial institutions to secure general loans to them amounting to $90,000 more than the aggregate indebtedness of the appellees' customers, for which their securities had been pledged by them respectively. Consequently the stock of the appellants, upon the payment of the amount then owing by them to the appellees, could not have been withdrawn from those with whom it had been rehypothecated, and the appellees, having no other stock of like kind and amount, were unable to comply with the demand made upon them.

The appellants then tendered to the appellees the sum of $3,110.96, the amount then owing, and demanded a receipt therefor, acknowledging payment in full of the entire indebtedness owing by them on account of the purchase of the stock. This, the appellants say, the appellees refused to do, but the appellees deny that such tender was ever made to them.

It is conceded by the appellees that, on the 12th day of December, 1920, and for some time previous thereto, they were insolvent, and that their liabilities exceeded their assets by the sum of $100,000 at least, and that the same was known to them certainly from the 10th day of December, 1920.

On the 13th day of December, 1920, the firm of William Schwarz & Sons, appellees, and the individual members of the firm, made a deed of trust to Harry N. Baetjer for the benefit of their creditors. This deed was filed on the 14th day of December, 1920, and thereafter, on the same day, the trustee filed his bond as such trustee; but the appellants had, in the meantime, sued out of the Superior Court of Baltimore City the writ of attachment in this case against the appellees, which was laid in the hands of the Mercantile Trust and Deposit Company, prior to the filing of said deed and bond.

The affidavit alleges that William Schwarz & Sons, appellees, are *bona fide* indebted unto Turner & Thomas in the sum of $4,629.04, being above all discounts, and the said Turner & Thomas have every reason to believe:

1. That the said Howard S. Schwarz and Allen Schwarz, trading as William Schwarz & Sons, have assigned, disposed of, or concealed, or are about to assign, dispose of, or conceal their property or some portion thereof, with intent to defraud.

2. That the said Howard S. Schwarz and Allen Schwarz, trading as William Schwarz & Sons, fraudulently contracted the debt or incurred the obligation aforesaid.

The account filed with the affidavit is as follows:

"Baltimore, Md., Dec. 14, 1920.

"Howard S. Schwarz and Allen Schwarz, co-partners, trading as William Schwarz & Sons, to George J. Turner and W. D. Nelson Thomas, trading as Turner & Thomas, Dr. to money received as part payment on purchase price of forty-three (43) shares of The National Bank of Baltimore stock........$4,629.04."

The declaration contains four counts for money payable by the defendants to the plaintiff :

1. For money lent by the plaintiffs to the defendants.

2. And for money paid by the plaintiffs for the defendants at their request.

3. And for money received by the defendants for the use of the plaintiffs.

4. And for money found to be due from the defendants to the plaintiffs on accounts stated between them.

There is, in addition to the above, one special count, which alleges that the appellees agreed to purchase for and deliver to the appellants forty-three shares of the above mentioned stock, at and for the sum stated, the amount of the purchase price therefor being $7,740, and of this sum the appellants have paid to the appellees $4,629.04, leaving a balance of $3,110.96 owing thereon, which they are ready and willing to turn over and deliver to the defendants, and which they have tendered to the defendants in full payment of said stock, but, as alleged therein, the defendants have neglected and refused to deliver to them the certificates representing said shares of stock, and have failed to comply with their obligation under said contract, whereby the plaintiffs have been greatly damaged.

Harry N. Baetjer, the trustee under the deed from the defendants in the attachment proceedings, moved to quash the writ, assigning the following reasons :

"Because the debtors, whose goods, chattels, moneys and securities were so attached are residents of Maryland and had prior to the institution of this suit conveyed their property to the said Harry N. Baetjer, trustee, by deed, for the benefit of all creditors, and have not assigned, disposed of or concealed their property or any portion thereof with intent to defraud their creditors, nor did they fraudulently contract the debt or incur the obligation sued on."

At the hearing upon the motion to quash, no evidence was taken, but in lieu thereof an agreed statement, containing the facts stated above, was signed by the respective counsel and filed in the case.

The fraud relied on as the basis or foundation of the attachment proceedings, is the conduct of the appellees in re-hypothecating the stock of the appellants, without their authority or consent, to secure a personal loan or loans to them much greater in amount than the indebtedness owing by the appellants to the appellees, whereby the appellees became unable to return to the appellants either the stock so pledged, or stock of like kind and amount, upon the latter paying or offering to pay to the appellees the indebtedness for which the stock was pledged with them, which act it is claimed was an unlawful conversion of said stock.

In 4 *R. C. L.* 267, it is said: "A broker has no common law right to separate the pledge from the debt by pledging for the purpose of securing his own indebtedness. While this is the rule, its practical effect is very largely obviated by the character of the property which is the subject of the pledge and by the custom of dealing in particular markets. Shares of stock or securities of the same kind are identical in character, being devoid of an individuality that distinguished one from another in value or desirability. Accordingly it is held to be unnecessary for a broker to retain in his possession the identical stock purchased by him on his customer's order, it being sufficient if he has in his possession or under his control a quantity of the stock or bonds in question equal to that purchased, which he can deliver to the customer when the account is closed. It naturally follows, therefore, that he may use the property purchased upon margin, as the exigencies of his business may require, so long as he has in his possession sufficient shares or bonds of the same kind to meet the demands of his client. To a certain extent, this is conducive to the relaxation of the strictness of the common law rule denying the right to repledge. * * * While the right to

do so is sometimes expressly reserved, the general consensus of judicial opinion is that even in the absence of such a reservation, it is to be implied where the contract between the broker and his client is entered into with knowledge of the custom to repledge, for under such circumstances the custom is deemed to enter into and form a part of the contract itself." But, as said on page 287 of said work, "His right to repledge is limited in its extent to the amount of the indebtedness that is due him from his client. Consequently, if he repledges for a greater amount, it is an act of conversion on his part,"—citing *Clarke* v. *Baillie*, 45 Can. Sup. Ct. 50 Ann. Cas. 1912 B 548, and note. "The purpose of this is to protect the customer so that if necessary he could go to the pledgee of the broker and obtain his securities by payment of the amount of his indebtedness due to his broker." 4 R. C. L. 268.

It is said in 9 *C. J.* 544: "A broker who has bought stock for another, * * * may, so long as he has not been paid or tendered the amount of his advances, pledge it to the extent of his lien thereon as security for his own debt to a third person without being guilty of conversion or breach of contract, provided the broker has the stock under his control, and can resume possession by paying the amount borrowed thereon. * * * But he is guilty of conversion if he pledges the stock purchased for an amount greater than the amount of his lien thereon, or if he resells or otherwise uses the stock in a manner inconsistent with the customer's ownership, without retaining control of sufficient similar stock, so that he is unable to make delivery on demand and a tender of his balance of the price,—citing *McNeil* v. *New York Tenth National Bank,* 46 N. Y. 325; *Mayer* v. *Monzo,* 151 App. Div. 866, 137 N. Y. S. 616; *Rothschild* v. *Allen,* 90 App. Div. 233, 86 N. Y. S. 42, 180 N. Y. 561; *Matter of Pearson,* 19 App. Div. 478, 46 N. Y. S. 557; *Douglas* v. *Carpenter,* 17 App. Div. 329, 45 N. Y. S. 219: *Sproul* v. *Sloan,* 241 Pa. 284.

In *Sproul* v. *Sloan, supra,* the court said, quoting from 31 *Cyc.* 837: "One to whom stock has been pledged for a loan has full power to hypothecate it so long as the original pledgor may obtain possession of it upon payment of his debt; but if it has been mingled with the other securities of the pledgee, or has been rehypothecated by him to secure a different or larger debt than that for which it was pledged to him, or if the collaterals have been transferred, but the obligation they were given to secure retained, or if it has been in any way placed beyond the control of the pledgee, this is a conversion." *Strickland* v. *Magoun,* 199 App. Div. 113, 104 N. Y. S. 425, 190 N. Y. 545, 83 N. E. 1132.

And it was said by this Court in *German Savings Bank* v. *Renshaw,* 78 Md. 488: "It was the right of Renshaw to have a return of his stock upon making good his indebtedness to the Nicholsons, and it was their duty so to use it, that this right of Renshaw should be fully preserved. The rule in such a case is well stated in *Lawrence* v. *Maxwell,* 53 N. Y. 19, 23: 'Conceding the right to use the stock pledged by way of hypothecation or otherwise as claimed, and that it was out of the actual possession of the defendant, it was his duty at once to regain possession and restore the same to the plaintiff. A neglect or refusal to do so, gave the plaintiff an action as for a conversion of property.'"

The courts of New York, in addition to the courts of other states, have, by a long line of decisions, held that where the pledgee of stock has rehypothecated it to secure a personal loan to him for a sum greater than the amount for which it was pledged with him, and he has by so doing placed the stock beyond his power to return it, or stock of the same kind, to the pledgor, upon his paying or offering to pay the indebtedness for which it was pledged, there is a wrongful conversion of the property.

As was said by MR. JUSTICE DAY, who delivered the opinion in *Richardson* v. *Shaw,* 209 U. S. 365, 52 L. Ed. 835, the decisions of the courts of the State of New York, where

such transactions are most numerous, are entitled to great weight and consideration.

It is, however, contended by the appellees that in this case the power and authority to rehypothecate the stock to secure a personal loan for a sum greater than the amount for which the stock was pledged by the appellants was expressly conferred upon them by the provisions of the notes by which the stock was pledged as collateral security for the payment of the indebtedness evidenced by such notes, and by a memorandum appearing at the head of each of the quarterly statements rendered by the appellees to the appellants as to the *status,* at such times, of their account with them.

In the notes referred to is found the following provision :

"We herewith deposit as collateral security for the payment of said sum of money * * * the securities herein named, and we do hereby authorize the holder of this note to *use, transfer, hypothecate* or *rehypothecate said securities,* or any of them, the holder hereof agreeing, as evidenced by the acceptance of this note, to *return unto us upon the payment or tender of payment of the amounts hereby secured at the maturity* of this obligation, *securities of like kind and amount,* but not the specific securities, as those now deposited * * * as collateral security for the payment of this note."

And the memorandum referred to at the heading of the statement mentioned is as follows :

"It is understood and agreed that all securities carried in this account or deposited to secure the same may be carried in our *general loans* and may be sold or bought at public or private sale, without notice, when such sale or purchase is deemed necessary by us for our protection."

The power and authority conferred upon the appellees by the provision found in each of the notes to "use, transfer, hypothecate and rehypothecate the securities of the pledgor"

was subject to the further provision therein contained that the appellees were to return to the appellants, if not the stock pledged by them, stock of like kind and amount, upon the payment or tender of payment to them by the appellants of the indebtedness secured by the collateral notes.

The obligation resting upon the appellees was that they should so use and rehypothecate the securities pledged with them as to be able to comply with the condition to return to the appellants, upon the payment or tender of payment of the indebtedness owed by them, stock of said bank equal in amount to the stock pledged, though not required to return the specific shares of stock pledged, the ownership of which was evidenced by the certificate or certificates thereof. This they failed to do when they placed the pledged stock beyond their control by the rehypothecation of it, with others, to secure a personal loan to them greatly in excess of the indebtedness for which it was placed with them, without having at such time in their possession and under their control stock of said bank of the amount of that pledged with which to comply with the condition imposed upon them, and, because of such failure on their part, the rehypothecation of said stock amounted to an unlawful conversion of it by the appellees..

But it is further contended by the appellees that they were authorized and empowered to rehypothecate the appellants' stock, in the manner in which they did, by virtue of the memorandum above mentioned appearing at the head of the quarterly statements rendered by the appellees to the appellants, showing the condition of their account with them, in which it was stated that "it is understood * * * that all securities carried in this account * * * may he carried in our *general loans,*" etc.

This memorandum, it seems, appeared upon all statements sent out by the appellees to their customers, whether the customer to whom it was sent had or had not an agreement with them in respect to their right to use, transfer, hypothe-

cate or rehypothecate the customer's securities in the pro-
curement of loans to them. To the appellants, who had a
special written agreement with the appellees by which the
rights of both parties thereto were clearly limited and defined,
a mere printed general statement appearing at the head of the
quarterly statements, inconsistent with the provisions of the
written agreement, had, as to them, no special significance
or meaning. It is not to be supposed that the appellants, in
view of their written agreement with the appellees, regarded
the statement contained in the memorandum as applying to
them, and as having the possible effect of depriving them of
the right conferred upon them by said written agreement,
under which they parted with the securities, to have such
securities, or securities of like kind and amount, returned
to them upon the payment or tender of payment of the in-
debtedness owing to the appellees. Nor should such effect
be given to the statement in the memorandum.

There is, however, a further contention made by the ap-
pellees, and one upon which they seem chiefly to rely in sup-
port of the order passed by the court below quashing the
attachment. It is contended by the appellees that the at-
tachment should not lie, because, as alleged by them, the
debt or obligation forming the foundation or ground work of
the attachment was not fraudulently *contracted* or *incurred*
by the appellees, in that, at the time the contract was made, in
respect to the return of the securities pledged, or securities of
like kind and amount, no fraud, or intention to defraud on
the part of the appellees existed. It was not essential to
the validity of the attachment that any fraud or intention
to defraud at that time should have existed.

In cases of this character, the law, as summarized by Mr.
Jones, in his work on *Pledges,* sec. 496, and approved by
the United States Supreme Court in *Richardson* v. *Shaw,*
*supra,* is as follows: "The broker acts in a threefold rela-
tion: First, in purchasing the stock he is an agent; then, in
advancing money for the purchase, he becomes a creditor;

and finally, in holding the stock to secure the advances made, he becomes a pledgee of it."

The appellees in this case held the forty-three shares of the stock of the National Bank of Baltimore, belonging to the appellants, as pledgees, it having been pledged to them by the appellants to secure the amount which remained owing by the appellants to the appellees upon the purchase price of the stock bought by the appellees for and on behalf of the appellants.

The appellees having advanced part of the money with which to purchase the stock or securities afterwards pledged with them, were also creditors of the appellants to the amount of such unpaid advancement, which at the time of the rehypothecation of the stock amounted to $3,110.96. But, upon the wrongful rehypothecation and conversion of the stock, the appellees thereby ceased to be the creditors of the appellants, and, because of said act of the appellees, they from and after such time became the debtors of the appellants. And it was that act of the appellees that constituted the alleged fraud complained of. The creation of the debt therefore was simultaneous with the commission of the alleged fraud.

It is true, as contended by the appellees, that the debt or claim upon which an attachment will issue must arise out of a contract, but it need not be an express contract. It is sufficient if it arises out of an implied contract, as in this case.

In *Downes v. Baltimore City,* 111 Md. 694, Downes, as alleged in the account, was indebted unto the Mayor and City Council of Baltimore in the sum therein named for money *stolen* by him from the Mayor and City Council and appropriated to his own use. One of the grounds of the motion to quash the attachment in that case was that "there was no contractual obligation due the plaintiff induced by the fraud of the defendant." This Court said, speaking through JUDGE PEARCE: "The foundation of such an attachment is the averment of an existing indebtedness, so that our inquiry must be what circumstances or facts will warrant an averment or affidavit of indebtedness. If one buys goods of another,

intending to pay for them on the terms stipulated, but failing to do so, he may if a non-resident, or an absconder, be proceeded against by attachment. If, being a resident, he buys goods, not intending to pay for them, or if after his purchase, he assigns or disposes of his property or is about to do so, with the intent to defraud his creditors, he may be proceeded against in like manner. Why then, if by theft, he acquires possession of the goods or money of another, with the intent to defraud such other person, may he not be proceeded against by attachment? Is he any the less, in law or in morals, a debtor, because he has acquired possession of another's goods by violence or trespass, than if he had acquired possession by a contract unmixed with fraud, at the time the contract was made, or by a contract obtained by fraud or artifice on his part? We do not think so; the highest court in this State has long ago decided that this term *'indebted,'* as used in the attachment acts is not to be construed in a technical or strict legal sense. *Wilson* v. *Wilson,* 8 Gill, 192; *Franklin* v. *Claftin,* 49 Md. 38. It should be conceded that the claim must arise *ex contractu,* but this contract may be implied.'

And in the same opinion it is said: "The test of jurisdiction which is thus necessarily suggested, is this. If the facts thus alleged would sustain an action of assumpsit in the ordinary form, the attachment should lie, if they would not, the motion to quash should prevail."

In the early case of *Murphy* v. *Barron,* 1 H. & G. 258, which has been followed in many cases subsequently decided by this Court, it was said: "The action for money had and received is an equitable action, and equally as remedial in its effects, as a bill in equity. *Evans,* in his *Essay on the Action for Money had and received,* 23, states the principle to be, that a suit in equity must be considered as being merely equivalent to an action for money had and received; and one of the grounds upon which this action can be supported, is where money has been paid upon a consideration which has failed. * * * In *Moses* v. *Macferlan,* 2 Burr, 1012, Lord Mansfield says, 'the gist of this kind of action is, that the

defendant, upon the circumstances of the case, is obliged by the ties of natural justice and equity, to refund the money' * * * If one man takes another's money to do a thing, and refuses to do it, it is a fraud; and it is at the election of the party injured either to affirm the agreement, by bringing an action for the non-performance of it; or to disaffirm the agreement *ab initio*, by reason of the fraud, and bring an action for money had and received to his use."

The alleged debt or obligation incurred in this case arose out of an implied contract resulting from the wrongful conversion by the appellees of the appellants' stock; and because of such wrongful conversion, by which the appellees were prevented from performing their part of the contract made with the appellants, it was within the rights and power of the latter to disaffirm said contract so made with the appellees and to sue for and recover the amount owing to them by the appellees upon the said implied contract under the count in their declaration "for money had and received."

The learned court below, we think, erred in sustaining the motion to quash the atachment and we will, therefore, reverse the order appealed from.

> *Order reversed and cause remanded, the appellees to pay the costs.*