Moses Rosenthal, Appellant, v. Frank G. Brown et al.,
Copartners under the Firm Name of Brown, Fried-
lander & Co., Respondents.

Contract — brokers — conversion — agreement authorizing
brokers to buy or sell securities carried or borrowed for customer
does not cover the purchase of cotton futures — stipulation on
confirmation slips that marginal business may be closed with-
out notice — strict performance may be waived by promise to
give time to put up additional margin — new consideration not
required to support such a waiver — action to recover for closing
out of plaintiff's account without proper notice — erroneous
dismissal of complaint — finding that plaintiff did not act in
reasonable manner to protect his account unsustained by
evidence.

1. A written agreement by which plaintiff authorized defendants,
his stockbrokers, " when, in the exercise of your judgment, it may be
necessary for your protection, to sell or buy any securities which you
may be carrying or have borrowed for me," without prior notice
or demand or call of any kind, does not cover the case of the pur-
chase of cotton futures on plaintiff's account to enable defendants to
deliver cotton which plaintiff had sold short.

2. A stipulation on the confirmation slips that all marginal business
might be closed without notice may be affected by subsequent promises
not based on an actual pecuniary consideration. Strict perform-
ance may be waived by any agreement, declaration or course of con-
duct on the part of the broker which leads the customer to believe that
time will be given him to put up additional margin, and no new or
independent consideration is required to support such a waiver.

3. Where, therefore, in an action to recover for the closing out of
plaintiff's account without proper notice to him, it appeared that
plaintiff had, through defendants, sold cotton on contracts for future
delivery on a margin and been notified by defendants to put up more
margin before publication of the government report the next morning,
but that in a telephone conversation defendants' margin clerk had told
him that it " would be all right if he got it around before twelve
o'clock," and that the next morning plaintiff with bonds and cash
arrived at defendants' office at 11:10 o'clock and was informed that he
had been sold out, notice of their intention so to do on or before 10:45
o'clock having been left at plaintiff's office at about 10:30 o'clock, in face
of a finding that the notice was not reasonable, a dismissal of the com-

plaint was error. Defendants' promise to give plaintiff until noon to put up the additional margin was a definite extension of time and they were bound to give reasonable notice of their intention to retract.

4. No evidence sustains a finding that plaintiff did not act in a reasonable manner to protect his account with defendants.

*Rosenthal* v. *Brown,* 222 App. Div. 763, reversed.

(Argued February 16, 1928; decided March 27, 1928.)

Appeal from a judgment of the Appellate Division of the Supreme Court in the second judicial department, entered December 19, 1927, affirming a judgment in favor of defendants entered upon a dismissal of the complaint by the court at a Trial Term.

*William R. Dorman* and *Charles Bates Dana* for appellant. As to the contracts in question on October seventh and October eighth, an express definite agreement was made. (*Blaine* v. *Thomas,* 103 App. Div. 600; *Small* v. *Housman,* 208 N. Y. 115.) A broker intending to close out cotton contracts or stocks of his customer must give the customer reasonable notice of the time and place of such closing. (*Peschke* v. *Wright,* 93 Misc. Rep. 154; *Mayer* v. *Monzo,* 221 N. Y. 442; *Fairchild* v. *Flomerfelt,* 79 Misc. Rep. 42.)

*B. F. Norris* and *George S. Franklin* for respondents. In purchasing cotton for plaintiff's account on October 8, 1924, defendants were acting within the terms of a written contract between plaintiff and defendants. (*Smith* v. *Craig,* 211 N. Y. 456.)

Pound, J. Plaintiff traded in cotton futures and stocks on the New York Cotton and Stock Exchanges. Defendants, his brokers, were members of the New York Cotton Exchange and the New York Stock Exchange. The action is for conversion in that plaintiff claims that defendants on October 8, 1924, closed out plaintiff's account without proper notice to him. He had, through them, sold cotton on contracts for future delivery on a margin. They closed him out by buying cotton on con-

tracts for future delivery on his account to protect themselves from loss. Defendants rely entirely on an agreement dated August 21, 1924, which reads as follows:

"BROWN, FRIEDLANDER & CO.,
"27 William Street,
"New York.
"*August 21st,* 1924.
"Messrs. BROWN, FRIEDLANDER & CO.:

"DEAR SIRS. * * * I agree that all transactions with you are subject to the rules and customs of the New York Stock Exchange and its clearing house (or such other Exchange or place where such business is usually transacted); and I consent that when, in the exercise of your judgment, it may be necessary for your protection *to sell or buy any securities which you may be carrying* or have borrowed *for me,* such sale or purchase may be made on the New York Stock Exchange or such other Exchange or place where such business is then usually transacted, or at public auction or private sale without advertising the same and *without prior notice to me and without prior demand or call of any kind upon me, it being understood that a prior demand or call or prior notice of the time and place of such sale or purchase shall not be considered a waiver of your right to sell or buy said securities as hereinbefore provided.* * * *

"Yours truly,
"MOSES ROSENTHAL."

The confirmation slips on purchase and sale of cotton contained the words: "It is further understood that on all marginal business Brown, Friedlander & Co. reserve the right to close without notice transactions where margins are near exhaustion."

The agreement relied on does not cover the case. The word "securities" in its broadest sense, includes not only bonds and other promises to pay money but also evidences of property such as corporate stocks.

31

(Century Dict.) There is greater doubt whether it includes contracts for the delivery of cotton on a future day. (*Smith* v. *Craig*, 211 N. Y. 456, 460.) Stocks are obviously securities within the meaning of the parties, although they are not evidences of debt, and in the view of the defendants contracts for the future delivery of cotton might also be included in the term as thus used. The language is, however, maladroit as applied to the purchase of cotton futures on plaintiff's account to enable defendants to deliver the cotton which plaintiff had sold short. They were carrying plaintiff's contracts, but they did not sell them, as appears by the following history of the case. They must, therefore, rely on their right to close marginal business without notice, reserved on the confirmation slips.

On October 7, 1924 (the day before the alleged conversion), plaintiff had sold for future delivery, through the agency of defendants, as brokers, 350,000 pounds of cotton worth $91,852.50. Plaintiff, of course, had no cotton to deliver. He had on deposit with the defendants, according to their claim, only $1,800 as security for his obligation to deliver the 350,000 pounds of cotton.

All transactions had between plaintiff and defendants were, by the terms of the agreement of August 21, 1924, subject to the rules of the New York Cotton Exchange.

According to the rules of the New York Cotton Exchange, as is commonly known, each sale of cotton requires an actual delivery of the amount sold; each member of the Exchange is required to guarantee the fulfilment of such a contract. The consequence is that, if this plaintiff failed at any time to purchase 350,000 pounds of cotton to deliver, in accordance with his contracts, defendants would be obliged to make the delivery and assume any loss that might be incurred. Defendants' claim is that plaintiff empowered defendants to purchase cotton when necessary in their discretion for his account for delivery in compliance with his existing

contracts of sale, without any notice being given to plaintiff. This was to enable the defendants to avoid risk of loss due to insufficient margin.

The current daily market price of future cotton is affected by the United States government report on the cotton crop which is published every two weeks. One of these reports was due on October 8, 1924. On October 7 defendants informed plaintiff that he must put up a further margin before the government report. The report is made public at eleven o'clock in the morning, Eastern standard time. Both parties seem to have assumed that this would be at twelve o'clock, Daylight saving time, which had been operative during the summer months. The report came out at eleven o'clock.

Plaintiff did not put up any additional margin. Defendants bought cotton for plaintiff's account before the government report came out, and closed out his account. They claim the right thus to close the account under the agreement dated August 21, 1924, quoted above which is inapplicable thereto.

Plaintiff relies on a special agreement not to close him out before twelve o'clock. His narrative in substance is as follows: On October 7 he telephoned to defendants. Hammer, their representative through whom he dealt, said: " You know the report is coming out tomorrow at twelve o'clock and they think you better put up a further margin before the Government report." Nugent, the margin clerk, then told him $3,000 would be all right if he got it around before twelve o'clock. Hammer said all right and plaintiff said: " I will be down tomorrow before the report, or before twelve o'clock."

Plaintiff lived in Bensonhurst, Brooklyn. On the morning of October 8 he secured from his safe deposit vault $6,500 in bonds and cash and started for his place of business in Newark. At 10:25 a. m. he telephoned Hammer to inquire the condition of the market. He was then told that a mistake had been made about the

[247 N. Y. 479]     Opinion, per Pound, J.     [Mar.,

hour of the government report and that they were going to sell him out. He came to the office of defendants as rapidly as he could, arriving at 11:10 and was notified that he had been sold out. A notice was left at plaintiff's office in Forty-second street at about 10:30 on the same morning threatening to close out plaintiff's account " on *or before* 10:45 A. M. today," but plaintiff did not receive this notice until after he had left defendants' office.

The jury answered certain questions submitted to them by the trial court as follows:

" Question 1: Did the plaintiff, either through the agreement he signed or through the several confirmatory statements he received from the defendants or through both of these sources, know that the defendants claimed the right to sell out all marginal accounts without notice, for the purpose of protecting their interests?

" Answer: Yes.

" Question 2: Did the defendants on October 7, 1924, inform the plaintiff that the additional margin they demanded to protect plaintiff's account would be received by them until 12 o'clock noon (Oct. 8)?

" Answer: Yes.

" Question 3: Did the defendants telephone the plaintiff's home on the evening of October 7, 1924, and on the morning of October 8, 1924?

" Answer: No.

" Question 4: Did the defendants make reasonable efforts to notify the plaintiff before closing out of the plaintiff's account, of their intention so to do?

" Answer: No.

" Question 5: Did the plaintiff on October 8, 1924, act in a reasonable manner to protect his account with the defendants?

" Answer: No."

And thereupon the trial court dismissed the complaint.

If defendants had no right to close the transaction, as they sought to do by purchasing cotton on plaintiff's

account, they were liable to the plaintiff for damages. (*Campbell* v. *Wright,* 118 N. Y. 594; *Rogers* v. *Wiley,* 131 N. Y. 527, 536; *Matter of Mills,* 139 App. Div. 54, 61; *Barber* v. *Ellingwood,* 144 App. Div. 512.) In this case there was notice on the confirmation slips that all marginal business might be closed without notice but a stipulation permitting such transactions to be closed without notice may be affected by subsequent promises, not based on an actual pecuniary consideration. If the broker waives the right to exact strict performance, and gives time and indulgence to the customer, he cannot recall this waiver at his own option without giving notice to the customer, to the end that the latter may have an opportunity of protecting the account. Good faith will not permit the broker, after having once waived the right to close the account without notice upon default of payment at the prescribed time, suddenly to stop short and insist upon closing the account when the other party is not prepared to put up the margin. Strict performance in such cases may be waived by any agreement, declaration or course of conduct on the part of the broker which leads the customer to believe that time will be given him to put up additional margin, and no new or independent consideration is required to support such a waiver. (*Toplitz* v. *Bauer,* 161 N. Y. 325, 333.)

The defendants' promise to give plaintiff until noon on October 8, 1924, to put up the required margin was a definite extension of time. While not an irrevocable contract, it could not be totally ignored to the prejudice of plaintiff. When the defendants by their promise led plaintiff to believe that he had nothing to fear if he put up the required amount before that hour, they were bound, at least, to give reasonable notice of their intention to retract this promise. (*Toplitz* v. *Bauer, supra; Small* v. *Housman,* 208 N. Y. 115.) It is hard to say what would be reasonable notice in the circumstances but here the jury found that the notice was not reasonable,

and it was, indeed, practically concurrent with the closing of plaintiff's account and no notice at all.

No evidence sustains the finding that plaintiff did not act in a reasonable manner on October 8 to protect his account with defendants. He acted as a reasonable man might have done although an overcautious man might have been in greater haste to put up his margin before eleven o'clock and before defendants changed their minds.

The judgments should be reversed and a new trial granted, with costs to abide the event.

CARDOZO, Ch. J., CRANE, ANDREWS, LEHMAN, KELLOGG and O'BRIEN, JJ., concur.

Judgments reversed, etc.