EDWARD McC. FISHER et al. *v.* ELEANOR H. DINNEEN.

[No. 65, October Term, 1931.]

*Decided January 14th, 1932.*

The cause was argued before Bond, C. J., Urner, Adkins, Offutt, Parke, and Sloan, JJ.

*James Thomas,* with whom were *Knapp, Tucker & Thomas* on the brief, for the appellants.

*Edward L. Ward,* for the appellee.

URNER, J., delivered the opinion of the Court.

The trial of this action of trover, before the lower court sitting as a jury, resulted in a verdict and judgment in favor of the plaintiff for $1,830.96, because of the conversion, by sale without notice, of certain stocks which the defendants had purchased on margin for the plaintiff and held as collateral security for her account. The only exception in the record is concerned with the ruling on the prayers.

There was no dispute in the evidence as to the decisive facts. The plaintiff's account with the defendants was opened in 1922, and was closed after the sale, on October 29th, 1929, of which this suit complains. No written agreement defined the relations and rights of the parties, except in so far as one might be implied from the fact that the numerous "confirmation slips," sent by the defendants to the plaintiff, reporting purchases ordered by her, included a printed memorandum as follows: "It is understood and agreed that all securities carried for your account, or deposited to secure the same, may be carried in our general loans or pledged either specially or generally on any loan we may see fit to make, and may be bought or sold at public or private sale without notice, when such sale or purchase is deemed necessary by us for our protection, and that we may settle contracts for the purchase or sale of securities in accordance with the rules and customs of the New York and Baltimore Stock Exchanges."

Because of a decline in the stock and bond market, the defendants, on October 24th, 1929, sent the plaintiff a written notice that her account was "short $800. of the necessary margin." In response to that notice, the plaintiff communicated with Mr. Butler, the defendants' representative, who had attended to all of her transactions with them, and it was agreed that some Wash., B. & A. Railway bonds held for

her account should be sold for its protection. The sale of those securities produced for the plaintiff's account a credit of $3,647.25. On the morning of October 28th the plaintiff inquired about her account, and was told by Mr. Butler that it was "bullet proof." When asked as a witness to define that expression, Mr. Butler said he meant that in his opinion the account was absolutely safe. Later on that day the market conditions became worse, and a call was mailed to the plaintiff for additional margin to the amount of $2,000. The plaintiff was unable to recall that she received that notice, but about half-past 10 o'clock on the morning of October 29th she had a telephone interview with Mr. Butler, in which, as he testified, she complained of the call for more margin in view of the assurance he had given her the day before, but consented to the sale of other Wash., B. & A. bonds and some American Gas & Electric Company bonds which her account included. They were sold on the Baltimore and New York Stock Exchanges, respectively, for $3,973, but the sales not having been accomplished, or reported, by noon, and with the market rapidly weakening under panic conditions, the defendants, without notice to the plaintiff, but after endeavoring to communicate with her by telephone, disposed of the stocks described in the declaration. They consisted of 1,000 shares (common) of the General Refractories Company and 50 shares (preferred) of the Utility & Industrial Corporation, and were selected by the defendants, in the exercise of their best judgment, as the securities in the plaintiff's list which could be sold most advantageously for her interests. The amounts realized from those sales aggregated $6,520.25. The credits from that source, and from the other sales, heretofore mentioned, for the plaintiff's account on the 29th, reduced her debit balance to $8,318.92, as against which the account still embraced securities having then a market value of $12,262. The market value of the remaining securities, however, was probably not more than sufficient to protect the account. Additional margin could have been provided by the plaintiff from her other resources. It was stated in her testimony that she had

no recollection of authorizing the sale of the Wash., B. & A. Railway and American Gas & Electric Company bonds on the morning of the 29th, but she makes no complaint of that transaction.

Having been thus assured, as she testified, that her account was "perfectly all right," and that she had "no occasion to worry about it in the least," she left her home for about two hours to do some shopping, and on her return was informed that Mr. Butler had been calling her on the telephone. She immediately called Mr. Butler, and, being told he was then out of the office, she requested that he telephone her on his return. About half an hour later he called her by telephone and reported the sale of the stocks with which this suit is concerned. When asked by the plaintiff why, knowing that she had sufficient means to protect her account, and after assuring her that morning that it was "bullet proof," he had sold the securities without giving her "a chance," he said that the sale had been ordered by Mr. Adams, a member of the defendant firm. Later in the same day the plaintiff had an interview with Mr. Adams, in which he offered to repurchase the General Refractories and Utility & Industrial stock for her account if she would provide more collateral, but the offer was declined, and the account was subsequently closed by the payment of the debit balance and the delivery to her of the unsold securities.

It is argued for the defendants that they were entitled to make the sale in controversy without notice to the plaintiff, in view of the express provision to that effect in the memorandum printed on the reports of her various margin purchases. The trial court found it "impossible to escape the conviction that Mrs. Dinneen (the plaintiff), an exceptionally intelligent and educated lady, knew and understood the terms of the memorandum and with that knowledge and understanding continued to deal for many years along precisely the same lines with the defendants." It was therefore concluded by the court that the memorandum was a part of the contract by which the case is controlled. This was a

610

question to be determined from a consideration of all the relevant circumstances. *Thompson v. Baily,* 220 N. Y. 471, 116 N E. 387; *Smith v. Craig,* 211 N. Y. 456, 105 N. E. 798; *Keller v. Halsey,* 202 N. Y. 588, 95 N. E. 634; *Meyer, Stock Brokers and Stock Exchanges,* pp. 439-444. It involved an issue of fact in regard to which there was, in our opinion, adequate basis in the evidence for the conclusion of the court sitting as jury.

The verdict for the plaintiff was rendered upon the theory that the defendants had waived the terms of the memorandum on the confirmation slips prior to the sale in which this cause of action originated. An exception to the refusal of a prayer for a directed verdict for the defendants requires us to determine whether there was legally sufficient evidence tending to prove such a waiver. In *Rosenthal v. Brown,* 247 N. Y. 479, 160 N. E. 921, 923, the Court of Appeals of New York said: "In this case there was notice on the confirmation slips that all marginal business might be closed without notice, but a stipulation permitting such transaction to be closed without notice may be affected by subsequent promises, not based on an actual pecuniary consideration. If the broker waives the right to exact strict performance, and gives time and indulgence to the customer, he cannot recall this waiver at his own option without giving notice to the customer, to the end that the latter may have an opportunity of protecting the account. Good faith will not permit the broker, after having once waived the right to close the account without notice upon default of payment at the prescribed time, to suddenly stop short and insist upon closing the account when the other party is not prepared to put up the margin. Strict performance in such cases may be waived by any agreement, declaration or course of conduct on the part of the broker which leads the customer to believe that time will be given him to put up additional margin, and no new or independent consideration is required to support such a waiver. *Toplitz v. Bauer,* 161 N. Y. 325, 333, 55 N. E. 1059."

The view of the trial court upon the question of waiver is thus concisely stated in its opinion: "The acts amounting to waiver (and estoppel) relied upon are the written notices of October 24th for margin (promptly and satisfactorily met), a similar written demand on October 28th; Mr. Butler's two assurances by phone that plaintiff's account was 'bullet-proof,' made as late as within two hours of the time the two stocks were put on the market by the defendants. As a result of such assurances, plaintiff went on her way (hence was out of reach by phone at her home during the two or three critical hours prior to 1.30 on October 29th) instead of protecting her account, which she was capable of doing. She certainly was not seeking to avoid notice. On the contrary she courted information. No consideration is necessary to support such a waiver, but, the right having been waived, reasonable notice of the revocation of the waiver must be given and proved. The acts referred to are in the judgment of the court sufficient evidence of a waiver." With that conclusion we agree. It is justified by the evidence, and it is consistent with the following Maryland decisions, which the court below cited in its opinion: *Shriver Oil Co. v. Inter-Ocean Co.*, 157 Md. 341, 146 A. 223; *Columbia Casualty Co. v. Ingram*, 154 Md. 360, 140 A. 601; *Leonard v. Union Trust Co.*, 140 Md. 192, 117 A. 318; *Penn Oil Co. v. Triangle Co.*, 136 Md. 559, 111 A. 482; *Linthicum v. Bagby*, 131 Md. 644, 102 A. 997; *Miller v. Mantik*, 116 Md. 279, 81 A 797.

One of the defendants' prayers was in the following form: "The court rules as a matter of law that if it is found from the evidence that the plaintiff employed the defendants as brokers to purchase stocks and other securities for her on margin—that is that the plaintiff in purchasing stocks or other securities put up a margin or portion of the purchase price and the defendants advanced the balance of the money with which to purchase the stock or other securities and retained the same when purchased as collateral securities for their advances—and if it is further found that stocks and securities were so purchased and held and that upon making

each purchase of stock or other securities purchased by the defendants for the plaintiff on margin, the defendants delivered to the plaintiff a confirmation of such purchase upon which appeared the following written stipulation: (heretofore quoted in this opinion), and if it is further found that no different contract or agreement between the plaintiff and the defendants was made or entered into for the carrying of stocks and securities on margin, then the written stipulation appearing on said confirmations constituted a portion of the contract between the defendants and the plaintiff respecting the carrying of stocks or other securities on margin." This prayer was granted after the court had amended it by the addition of the following proviso: "Unless the court sitting as a jury shall find from the evidence that the defendants, by their letters of October 24th and 28th and the assurances given plaintiff by telephone waived the above provisions of the above written stipulations and thereafter ·sold the plaintiff's stocks without notice to her and without her knowledge." It is said that the addition to the prayer was objectionable as submitting the question of waiver without definition of facts from which it might result. This court has said: "In determining whether there has been a waiver, it generally happens that there are facts which must be submitted to the jury, but the court instructs the jury as to the legal effect of their finding of such facts." *Shriver Oil Co. v. Interocean Oil Co., supra,* 157 Md. 355, 146 A. 223, 228; *Sumwalt Co. v. Knickerbocker Co.,* 112 Md. 437, 444, 77 A. 56; *Phillips Co. v. Boyer & Co.,* 133 Md. 119, 129, 105 A. 166. The clause added to the defendants' prayer specifically referred to uncontradicted facts from which a waiver might be inferred. The objection to the amendment is not sustainable.

An instruction proposed by the defendants would, if granted, have limited the plaintiff's recovery to nominal damages. There was no error in the rejection of this prayer or in the adoption of the New York rule as to the measure of damages in such cases, which is thus stated in *Mayer v. Monzo,* 221 N. Y. 442, 117 N. E. 948, 950: "The rule is that a person whose stocks have been converted is entitled

to a reasonable time after notice of the conversion within which to determine whether he will purchase other stocks in the place thereof, and that he may use as a basis for his claim of damages resulting from the conversion the highest prices which have prevailed during such reasonable period." The Supreme Court of the United States, in a case of the sale by a broker of his customer's stock without notice, said: "It has been assumed, in the consideration of the case, that the measure of damages in stock transactions of this kind is the highest intermediate value reached by the stock between the time of the wrongful act complained of and a reasonable time thereafter, to be allowed to the party injured to place himself in the position he would have been in had not his rights have been violated. This rule is most frequently exemplified in the wrongful conversion by one person of stocks belonging to another. To allow merely their value at the time of conversion would, in most cases, afford a very inadequate remedy, and, in the case of a broker, holding the stocks of his principal, it would afford no remedy at all. The effect would be to give to the broker the control of the stock, subject only to nominal damages. The real injury sustained by the principal consists not merely in the assumption of control over the stock, but in the sale of it at an unfavorable time, and for an unfavorable price. Other goods wrongfully converted are generally supposed to have a fixed market value at which they can be replaced at any time; and hence, with regard to them, the ordinary measure of damages is their value at the time of conversion, or, in case of sale and purchase, at the time fixed for their delivery. But the application of this rule to stocks would, as before said, be very inadequate and unjust. * * * Perhaps more transactions of this kind arise in the State of New York than in all other parts of the country. The rule of highest intermediate value up to the time of trial formerly prevailed in that state. * * * The hardship which arose from estimating the damages by the highest price up to the time of trial, which might be years after the transaction occurred, was often so great that the Court of Appeals of New York was constrained to introduce

a material modification in the form of the rule, and to hold the true and just measure of damages in these cases to be the highest intermediate value of the stock between the time of its conversion and a reasonable time after the owner has received notice of it to enable him to replace the stock. * * * On the whole, it seems to us that the New York rule, as finally settled by the court of appeals, has the most reasons in its favor, and we adopt it as a correct view of the law." *Galigher v. Jones,* 129 U. S. 193, 200, 9 S. Ct. 335, 337, 32 L. Ed. 658, 660 and 661.

In regard to the law applicable to stock conversion cases, it was said by this court in *Turner v. Schwarz,* 140 Md. 465, 472, 117 A. 904, 907: "As was said by Mr. Justice Day, who delivered the opinion in *Richardson v. Shaw,* 209 U. S. 365, 28 S. Ct. 512, 52 L. Ed. 835, 14 Ann. Cas. 981, the decisions of the courts of the State of New York, where such transactions are most numerous, are entitled to great weight and consideration."

There was no error in any of the rulings shown by the record.

*Judgment affirmed, with costs.*