HIGGINS, Justice.
 

 This is a suit by a customer against his stockbrokers, to recover damages said to have been sustained as a result of the alleged illegal and unauthorized sale of plaintiff’s stocks purchased on margin through defendants. The petition alleges that the defendants were employed by the plaintiff under a written contract dated August 22, 1932, as his brokers and agents, to buy and sell stocks for his account on a 30 per cent, margin, the balance of the purchase price being loaned by the defendants to petitioner at the prevailing interest rate and the stock being pledged as collateral; that on March 22, 1933, April 13, 1933, May 2, 1933, and May 8, 1933, due to declines in the stock market, defendants telegraphed or telephoned plaintiff that his account was below margin and the respective amounts that it would take to re
 
 *746
 
 store the account to proper condition; that in each and every instance plaintiff immediately complied with the request; that on July 19, 20, and 21, 1933, due to sharp declines in the market values of the stocks, plaintiff’s account was below margin to the extent of $31,082.54; that, contrary to their previous conduct in notifying plaintiff of tbe necessity of making a deposit to bring his account up to margin, defendants negligently failed to notify plaintiff, and on the evening of July 21 and on the morning of July 22, 1933, they sold out his entire holdings at the values listed on the New Orleans and New York Stock Exchanges; that defendants then notified plaintiff on July 23d that his account had been liquidated .at a deficit of $17,500, which amount they requested him to remit; that plaintiff immediately protested against the illegal actions of the defendants in selling his entire list of stocks without notice or without request being made upon him to bring his account up to margin, and demanded that his stocks be repurchased and his account reinstated, which defendants refused to do.
 

 The written contract is annexed to the petition, and the relevant part reads as follows:
 

 “ * * * I consent that when, in the exercise of your judgment it may be necessary for your protection to sell or buy any securities and/or contracts for commodities which you may be carrying or have borrowed for me * * *, such sale or purchase may be made on the New York Stock Exchange or such other Exchange or place where such business is then usually transacted, or at public auction or private sale without advertising the same and without prior notice to me and/or without prior demand or call of any kind upon me, it being understood that a prior demand or call or prior notice of the time and place of such sale or purchase shall not be considered a waiver of your right to sell or buy said securities as hereinbefore provided; * * *
 

 “Having been informed that no employee of your firm has any authority to waive, modify or alter in any respect, any of the terms of this agreement,, no such waiver, modification or alteration of the terms of this agreement shall be binding upon you unless committed to writing and signed by one of the members of your firm.”
 

 Defendants filed an exception of no right or cause of action on the ground that the contract expressly authorized the sale of the stocks without notice to the plaintiff, and further expressly stipulated that the giving of prior notice by the defendants to the plaintiff was not to be construed as a waiver of defendants right to sell the stocks without notice to the plaintiff.
 

 There was judgment sustaining the exceptions and dismissing the plaintiff’s suit, and he has appealed.
 

 The law is clear and the authorities are uniform to the effect that, although the broker in the written contract with his customer has reserved the right to sell, without notice, the stock carried by him on margin for his customer, the broker is estopped from setting up the right to Sell the customer’s stocks under the contract, as a defense to a suit by the customer against the broker for loss or damage claimed to have resulted from the sale of the stocks without prior notice
 
 *748
 
 to the customer and contrary to the course of dealings between the parties, when the acts, declarations, and conduct on the part of the broker have been such as to lead the customer, as a reasonable person, to believe that the broker would not exercise his right to sell without giving reasonable notice of his intention to do so. Smith v. Craig, 211 N. Y. 456, 105 N. E. 798, Ann. Cas. 1915B, 937; Bache v. Johnson, 255 Mich. 328, 238 N. W. 250, 76 A. L. R. 1517 and cases cited; Woodward v. Schiff (1932) 236 App. Div. 598, 260 N. Y. S. 274, affirmed (1933) 261 N. Y. 670, 185 N. E. 786; Kuhn v. Simons (1932) 143 Misc. 21, 255 N. Y. S. 633; Fisher v. Dinneen (1932) 161 Md. 605, 158 A. 9; Thomas v. Updike Grain Co. (1932) 60 S. D. 419, 244 N. W. 647; Miller & Co. v. Lyons (1912) 113 Va. 275, 74 S. E. 194; Rosenthal v. Brown (1928) 247 N. Y. 479, 160 N. E. 921; Toplitz v. Bauer (1900) 161 N. Y. 325, 333, 55 N. E. 1059; Disanza v. Merrill (1930) 137 Misc. 259, 241 N. Y. S. 739; Kellerman v. Libaire (1930) 137 Misc. 363, 242 N. Y. S. 182.
 

 This same theory of estoppel has been invoked against insurance companies which, on a number of occasions, have accepted premiums beyond the date on which they were due, and subsequently claimed that the policy was lapsed or forfeited, because on one occasion the insured failed to pay the premium within the time specified in the policy. Gunther v. Mutual Aid Ass’n, 40 La. Ann. 766, 5 So. 65, 2 L. R. A. 118, 8 Am. St. Rep. 554; Bush v. Liberty Ind. L. I. Co. (1930) 15 La. App. 269, 130 So. 839.
 

 The identical doctrine was applied against a lessor who repeatedly accepted delinquent rent without protest and then sought to cancel and annul the lease on the ground that the tenant failed to pay the rent within the time specified in the lease. This court held that the landlord was estopped by his contrary course of conduct from relying on the strict letter of his contract. Standard Brewing Co. v. Anderson, 121 La. 935, 46 So. 926, 15 Ann. Cas. 251; Bonnabel v. Metairie Cypress Co., 129 La. 928, 57 So. 271; Shnaider v. Graffagnini, 154 La. 363, 97 So. 491; Roth v. Fabian, 7 Orl. App. 422; Bacas v. Mandot, 3 Orl. App. 324.
 

 In Meyer on Stock Brokers and Stock Exchanges, § 108, p. 436, we find the following language:
 

 “It is customary for brokers on opening a marginal account to require the customer to sign a written agreement defining the conditions on which the account will be carried. This agreement ordinarily contains, among others, the following important provisions: (1) that all transactions are to be subject to the rules, regulations, customs and usages of the exchange or mai’ket whex'e the transaction is effected; (2) that the broker may repledge the eustomex*’s securities in the bi'oker’s genei-al loans or otherwise, either for the amount due by the customer or for a,greater amount, or may lend the customer’s securities to other brokers or deliver them on sales for other customers; (3) that the broker may, whenever he considers it necessary for his own protection, sell the customex-’s securities or close out the customer’s short commitments or commodity contracts without demand for additional margin or notice of sale.
 

 “These provisions, as we have demonstrated in other parts of this book, are of the ut
 
 *750
 
 most importance if the broker’s rights are to be safeguarded adequately. The principles of law applicable to stock brokerage transactions have been derived from general legal doctrines without regard to the special necessities of the stock brokerage business. * * * The protection against financial risk to which he is in fairness entitled demands that he be permitted to close out the customer’s account whenever a change in the market impairs the sufficiency of his margin. Yet he is required at his peril first to find his customer in order that a demand for additional security and notice of the time and place of the closing of the account be brought personally to the customer’s attention. A special agreement is therefore essential to give him the i-ights which the legitimate needs of his business demand, but which in the absence of the customer’s consent have been denied him by law.
 

 “Special agreements between broker and customer granting these rights are valid and will be enforced in accordance with their terms. It has been so held with respect to agreements binding the customer to the usages and customs, of the market where the transaction is effected, agreements permitting the broker to rehypothecate the customer’s securities without limit as to amount, and agreements dispensing with the necessity of demand for margin and notice of sale before closing out the customer’s account. An agreement relating to notice of sale may dispense with notice entirely or may fix a prescribed notice. It may permit a pz-ivate sale in lieu of the public sale which the law ordinarily requires. Such agreements are not contrary to public policy.”
 

 The author, continues in section 111, p. 446, as follows:
 

 “The right to sell without notice may be waived not only by promises but also by any act or course of conduct fz-om which it may reasonably be inferred that such right will not be invoked. The practice of making demand for mai-gin or giving notice of sale in pidor instances, Or the transmission of an insufficient notice in the instance where the sale is effected, may be considered by the jury in determining whether the right to sell without notice was waived.
 
 However, a provision in the agreement that specific demands or notices shall not destroy the broker's right to sell without notice will be given effect by the courts.”
 

 In the case of Klapp v. Bache (1930) 229 App. Div. 415, 242 N. Y. S. 155, 158, the action was similar to the instant one and the contract between the parties was practically the same as herein involved. The court said:
 

 “The respondent having expz-essly waived notice of sale and having expressly agreed that no specific notice of sale that might be given should invalidate this waiver, the appellants were entitled to rely upon the strict terms of the agreement, and were not guilty of conversion when they sold the securities. ‘The doctrine of estoppel lays at the foundation of the law, as to waivez.’ Underwood v. Farmers’ Joint Stock Ins. Co., 57 N. Y. 500, 505; Gearty v. Mayor, etc., of City of New York, 171 N. Y. 61, 72, 63 N. E. 804. Judge Peckham in New York Rubber Co. v. Rothery, 107 N. Y. 310, 316, 14 N. E. 269, 271, 1 Am. St. Rep. 822, held that to constitute estoppel ‘the person sought to be estopped must do some act or make some admission with an
 
 *752
 
 intention of influencing the conduct of another, or that he had reason to believe would influence his conduct, and which act or admission is inconsistent with the claim he proposes now to make. The other party, too, must have acted upon the strength of such admission or conduct. * * *
 

 “ ‘In eases of silence there must be not only the right, but the duty, to speak, before a failure so to do can estop the owner.’ In view of the contract between the parties, the appellants had no reason to believe that the notice of stop-loss orders would influence the conduct of the respondent, nor was there any duty to speak before proceeding under the strict terms of the agreement. Their act was not inconsistent with the claim they are now making. Neither did the respondent have any right to rely upon a waiver, because of his agreement that he would not do so. The judgment and order should be reversed on the law and the facts, with costs, and the complaint dismissed, with costs.”
 

 This case was affirmed without an opinion in (1930) 255 N. Y. 550, 175 N. E. 308. It was followed as an authority in 1932, in the case of Bond v. Winston, 235 App. Div. 841, 257 N. Y. S. 904, and in Crowell v. Cohen, 149 Misc. 872, 268 N. Y. S. 329.
 

 In the case of Emmons v. McCreery (1932) 307 Pa. 62, 160 A. 722, 723, the trial judge gave the plaintiff judgment against his broker for having sold his securities without notice, and in reversing the decision of the lower court the appellate court said:
 

 “It is admitted that when Emmons’ marginal account was low the stockbroker would notify him, requesting him to bring it up to condition; but a notice from a stockbroker to his client to make good his marginal account in no sense constitutes a waiver of that part of the contract which reads that the securities carried in -the customer’s account, pledged as collateral, may at any time be sold without notice whenever it is deemed necessary by the brokers for their protection. The broker may well conclude, although the customer’s account is below marginal requirements, that it is not ‘necessary * * * for their protection’ to sell the client’s collateral. To hold that such notice would operate as a waiver of the right to- sell would upset the ordinary course of business, and furnish a legal protection or excuse that would otherwise not exist, and which was not contemplated in the contract. Certainly nó person dealing with a broken would normally consider the receipt of notice as to deficiency in his margin a waiver of the broker’s right to sell. Therefore we hold that the demands of additional collateral or money to protect a marginal account are not of themselves waivers of a stockbroker’s right to sell the customer’s securities without notice if the broker’s protection demands it.”
 

 In the case of Godfrey v. Newman (1930) 135 Misc. 764, 239 N. Y. S. 585, 586, the plaintiff had a marginal account with the defendant stockbrokers and the written agreement between them provided that the plaintiff’s securities could be sold “without notice or call for margin, * * * if at any time their current market value shall not exceed 110% of” the indebtedness of plaintiff to the defendant
 

 In the fluctuating market of October 1929, the value of the plaintiff’s securities fell below that figure and the defendant sold them
 
 *754
 
 without notice to the plaintiff. It was contended that the sale was wrongfully made, because, shortly prior to the sale, the plaintiff spoke to the defendant’s representative about the matter and was advised that, if additional money were necessary, he would be notified. In deciding the case in favor of the defendant, the court said:
 

 “The defendants were authorized by the special contract to sell the securities without notice when their value reached a certain point. There is nothing against public policy in holding the parties bound by this contract that they themselves made. There is ordinarily an implied duty to call for more margin when the agreement is that the customer will maintain his margin, and there is ordinarily an implied duty to give notice of sale, so that the customer may have the opportunity of preventing a loss; but these implications have no place here, because the parties expressly agreed otherwise. A contractual duty will not be implied when the absence of it is clearly expressed.
 

 “The conversation between the plaintiff and the defendants’ customers’ man did not change the reciprocal rights and duties of the parties, and cannot therefore be the basis of the action. Assuming that the customers’ man had authority to contract, there was no new contract or modification of the old one, because, in either event, a consideration is lacking to make it valid. What the customers’ man said did not amount to a waiver of an existing power to sell, which might be good without consideration, because it does not appear that the account was then under the required percentage; if it should be claimed that it amounted to a waiver of the right to sell when that percentage would be reached, we would then have a modification of the contract that is invalid, because lacking consideration.
 

 “Nor could it be effectively contended that the conversation can predicate an estoppel on the. defendants. . The plaintiff -was, or should have been, aware of the provision in his contract under which the securities might be sold without notice the moment their value fell’below the 110 per cent. In the panicky condition of the market at the time, that might have been reached any moment. He,, in reasonableness, could not rely on the stability of any given factor for any space of time; nor could he reasonably expect the defendants in a toppling market to hold off selling, for their protection and possibly for his own. In fact, he himself would possibly have allowed the securities to go, with the hope of repurchasing at a lower figure, and thus recouping his loss. That is conjectural, of course, and, in retrospect, he has suffered damage. But I cannot see the breach of any legal duty by the defendants. Damages without such breach cannot be compensated at law.”
 

 In the case of Richardson v. American National Ins. Co., 18 La. App. 468, 137 So. 370, 376, the court held that where an accident insurance policy expressly provided that coverage or liability would be suspended for ten days after delinquent premiums were paid and accepted, this clause would be given legal effect, since the provisions in the policy constituted the law between the parties thereto and the stipulation was not against public policy.
 

 
 *756
 
 In dealing with the question of estoppel, the court said:
 

 “The distinction between the forfeiture clause cases and the suspension clause cases is that in the former the acceptance of the delinquent premium is inconsistent with the terms of the policy, thereby resulting in a waiver or an estoppel, but in the latter the acceptance of the premiums in arrears is in accordance with and under a special clause of the policy and, therefore, waiver and estoppel cannot be said to have resulted.”
 

 So it may likewise be said that in the absence of an express stipulation in the brokerage contract such as we are dealing with here, the giving of notice is inconsistent with the terms of the contract and has the effect of misleading the customer to his detriment, and therefore the broker cannot suddenly change his practice of giving notice and sell out or liquidate the account without notice.
 

 On the other hand, in the case where the express provision in question is placed in the brokerage contract, the broker is authorized to sell the security and close out the account without notice to the customer, in spite of the fact that the broker on prior occasions has notified the customer of the necessity of bringing his account up to margin, because the broker’s action in liquidating the account without notice is in accordance ^yith the specific provisions or authorization of the agreement.
 

 In making this distinction and statement ■of the law, we do so with full cognizance of the fact that parties to a contract may subsequently expressly or impliedly modify, alter, and change the agreement, either in writing or verbally, where their actions show that it was the intention of both parties to do so. There may also be instances where one of the parties to the contract by a course of conduct obtains certain advantages over the other party and retains the benefits thereof, to such an extent that the imposition may result in the court holding a plea of estoppel to be good. Of course, the same thing would be true where one of the parties, through misrepresentation or fraud, took advantage of the other. Lawrence v. L. L. Davidson Lbr. Co., 161 La. 111, 108 So. 303; Patterson & Co. v. Bonura & Co., 8 La. App. 449.
 

 In the instant case there are no allegations of fraud or misrepresentation, or that the defendants secured unjust or unfair advantage over the plaintiff and retained the benefits realized from any wrongful acts or misconduct.
 

 Learned counsel for the plaintiff rely mainly upon the case of Saxton v. Para Rubber Co., 166 La. 308, 309, 117 So. 235. The landlord in that case sued the tenant to cancel the lease and eject the lessee, because the rent was not paid promptly. The trial judge dismissed the plaintiff’s suit and he appealed. The defendant filed a motion to have the appeal dismissed on the ground that the landlord filed a second suit to recover four months’ rent maturing subsequent to the ejectment proceedings, contending that such actions constituted an acquiescence in the judgment appealed from. This court, in overruling the motion to dismiss, said:
 

 “The lease contains the following stipulation:
 

 “ ‘The receiving by lessor or lessor’s representatives of any rent in arrears, or after
 
 *758
 
 notice
 
 or
 
 institution of any suit for possession, or for cancellation of this lease will not be considered as a waiver of such notice of suit, or of any of the rights of lessor.’.
 

 “It is contended that this provision relates only to rent in arrears — that is to say, rent that was due when the suit in ejectment was filed — and has no reference to rent falling due after the filing of said suit, and that in suing for the subsequent rent the plaintiff has acquiesced in the judgment and consented to a continuance of the lease.
 

 “We cannot agree with such a restricted interpretation. The language is clear and, in our opinion, means just what it says, that the receiving of any rent in arrears, the receiving of any rent after notice or after institution of any suit for possession, or for cancellation shall not be considered as a waiver of such suit, or of any of the lessor’s rights.”
 

 It appears to us that the language of the court, rather than support the plaintiff’s position in the instant case, is in favor of the defendants, because we sanctioned the inclusion in the contract of lease of a clause which provided that certain designated conduct, which might otherwise constitute a waiver, would not, as between the contracting parties, be deemed a waiver.
 

 We are also referred to the case of Durant v. Block, 169 A. 848, 11 N. J. Misc. 919, 930. We do not believe that case apposite here, because the court found that the customer had been sold out without notice, after he had been assured and promised by one of the partners in the brokerage firm that his stocks would not be sold without notice, if he gave the broker certain designated, very valuable, additional securities which were disposed of by the brokers to their advantage and the benefits retained.
 

 Finally, it is said that the defendants took unfair advantage of the plaintiff by selling all of his securities and liquidating his account, after lulling him into a sense of security, leading him to believe that such action would not be taken without prior notice, and therefore such a contract which makes this possible is unconscionable and against public policy. It is well settled that a contract is the law between the parties. If they enter into an agreement that is not contra bonos mores, or against public policy, as expressed in our statute, its provisions should be enforced, unless the parties have changed, modified, or waived them, or been guilty of such conduct as to result in an estoppel.
 

 After a careful study of the allegations of the petition, we are of the opinion that the plaintiff has failed to bring his case within the category of any of these respective exceptions.
 

 Plaintiff was fully apprised of the fact that he was dealing with a highly speculative business. He knew that values fluctuate and vacillate rapidly in the stock market. He appreciated the necessity of intrusting vast and broad discretionary power and authority to his brokers, who also had a large amount invested in the stocks. We find nothing in our statute law or jurisprudence which would justify us in holding that such contracts as involved here are against public policy.
 

 For the reasons assigned, the judgment appealed from is affirmed.