## No. 10,163.

Mrs. Fannie Gunther et al. vs. The New Orleans Cotton Exchange Mutual Aid Association.

The fact that by the charter of a mutual benefit association a particular method of notice of assessments falling due is declared to be sufficient and binding on all members, does not exempt the corporation from the operation of the principles of equitable estoppel which apply to all other persons natural or juridical.

In matters affecting the execution of contracts, the doctrine of estoppel has no use or significance when the contract has been complied with; it is only in cases of non-compliance that the question arises whether the other party has, by his representations or course of contract, estopped himself from setting up such non-compliance as a ground of forfeiture.

Forfeitures are not favored by the law; and in cases of insurance, where the company has pursued a course of conduct which leads the insured honestly to believe that, by conforming thereto, his rights will be protected, the company will be estopped from claiming a forfeiture, although incurred under the letter of the contract.

Hence, though the charter provides only for notice by posting, yet if the company adopts the practice of always sending written notice by mail to a particular class of members of assessments due, and if on a particular occasion it failed to send such notice, and if the failure to pay was solely due to the want of notice, and if, as soon as informed, payment was tendered, the company is estopped from claiming the forfeiture.

Upon a review of the evidence, the facts of the uniform custom to send notices, and of the failure to send it in the particular case in which default occurred, that this was the sole cause of non-payment, and that payment was offered as soon as knowledge was obtained, are found established.

APPEAL from the Civil District Court for the Parish of Orleans. *Houston, J.*

*W. F. & D. C. Mellen* for Plaintiffs and Appellees.

*Bayne, Denegre & Bayne* for Defendants and Appellants:

Each one of the members of a mutual aid society contracts with each other member, and their contract is a law unto themselves by which they are bound. When the charter provides that the failure to pay terminates membership, this law is conclusive between the members. Madeira vs. Merchant's Exchange Mutual Benefit Society, 16 Federal Reporter, 750; 86 Illinois Reports, 479; 18 Central Law Journal, 373; 93 U. S. 31; 104 U. S. 88–252; 44 New York, 276; 63 Md. 86.

Sickness or insanity of the member does not excuse or waive such payment. 82 N. Y. 550; Hankshaw vs. Supreme Lodge Knights of Honor. 24 Central Law Journal, 129 and cases cited above.

There was no waiver made as to the manner of notice by adding notice by postal card. No such waiver was in fact, and neither the president nor directors could have made such waiver by any action on their part. The directors are merely administrators of the agreement made by the members with each other.

The opinion of the Court was delivered by

FENNER, J. The defendant is a corporation, organized as a mutual benefit association, the members of which, or their designated beneficiaries, are entitled, at death, to receive an amount equivalent to the sum of certain assessments which are levied upon, and payable by, the surviving members.

Plaintiffs exhibit a certificate of the association reciting the membership of Julius Aroni and that, "in consideration of twenty dollars by him paid as such, said Aroni has secured to his children (the plaintiffs) in the nature of insurance upon his life, all the benefits of said

association, subject at the same time to the conditions, limitations and penalties imposed by the charter of the association."

Defendant admits the original membership of Aroni and the right of plaintiffs to claim whatever is due under the certificate, but avers that, in accordance with the provisions of the charter, he had, prior to his death, been duly suspended for non-payment of assessments and had entirely forfeited his membership and all claims against the association.

The charter contains the following provision :

"Upon proof of the death of a member, each surviving member shall, within ten days, pay to the secretary the sum of ten dollars. A notice posted in the rooms of the Cotton Exchange shall be deemed a proper notification to all members. Any member not having paid within ten days shall be suspended and shall be treated as not being on the rolls of membership, and in case of his death during the period of such suspension, he shall forfeit all claims upon the association ; provided, however, that within thirty days from date of such notice, upon payment of any past dues, and any that would have accumulated had he remained a member of this association, his suspension shall cease. Should any member remain in default after the expiration of the said term of thirty days, he can only be reinstated by a vote of the board of directors, and upon payment of all arrears."

To become a member it was essential that the applicant should be either a member of the Cotton Exchange, or the holder of a power of attorney of a member, or a visiting member, or an employee, of said Exchange; but the charter provided that "any member may withdraw from the Cotton Exchange without severing his connection with this association."

The rule with regard to notice was evidently adopted with reference to the original conditions of membership, under which every member having access to the floor of the Cotton Exchange would have the opportunity to observe the posted notices.

But, as time went on, under the operation of the provision last quoted, there arose a class of members of the association who had ceased to be members of the Exchange and had lost the privilege of access to its rooms. As to them the posting of notices in a room which they were forbidden to enter, became obviously unavailing. We do not say that this change of condition operated the creation of any new right or imposed any duty upon the association to give a different notice from that required by the charter. It might have stood upon its rights and have held the excluded members to the hard lines of

their contract. But it did not choose to do so. On the contrary, it adopted the just and reasonable custom of sending by mail, written notices of all assessments due, to all such members, and even to others who requested it. It is true that the president says that he told such members as spoke to him on the subject that this was a matter of courtesy and not of right; but he does not pretend that he made such statement to Aroni.

Aroni had ceased to be a member of the Cotton Exchange. Under the custom above indicated, notices were always mailed to his address when assessments became due, and he always paid. The custom was to send notices, as soon as an assessment was posted, to all members who, like Mr. Aroni, were not admitted to the Exchange.

In November, 1885, Mr. Aroni was stricken with cerebral apoplexy and softening of the brain, from which date until his death, in the latter part of 1886, he remained in a state of mental incompetency.

Mr. Aroni had an office on Carondelet street and resided in rooms on Canal street, both of which were known to the officers of the association charged with giving notices. In February, 1886, two deaths occurred, of which notices were received at his office, and his son, Mr. Ernest Aroni, promptly paid the assessments.

On March 27, 1886, another member, Mr. Friedlander, died. No notice was ever received of this death either at the office or residence of Mr. Aroni. Mr. Mellen, his friend and associate in much legal business, testifies that he regularly examined his mail and that no such notice came—if it had, he would have attended to it. Mr. Ernest Aroni states he was with his father day and night at his residence and that no such notice came there.

The officers of the association testify that notices were sent out as usual and they presume one was sent to Mr. Aroni, but they do not profess to remember it as a fact or to have any record of any kind to confirm their impression based simply on their ordinary course of proceeding. The liability to accidental omission in sending a large list of notices is too great to justify us in giving to this testimony sufficient weight to overthrow the presumption resulting from the fact that all other notices sent reached their destination and that this one certainly did not.

Another fact still more strongly weighs against the defendant. On the 31st of March, 1886, Mr. R. N. Lewis, another member, died. This was several days before the expiration of ten days from the death of Friedlander, at a time when Mr. Aroni was, in no manner, in default, when the custom clearly entitled him to immediate notice of

the assessment, and when there was no excuse for not sending it. If the former notice had simply been miscarried in the mail, it is not likely that a similar accident would have happened a second time.

If the latter had been received, all the consequences of the former accident would have been averted. Yet it is admitted that, in this case, no notice was sent. The admitted failure to give notice in this case, being without excuse, supports the probability of failure in the former, and places the association in fault.

There is not the slightest ground for attributing the failure to pay these assessments to any other cause than want of notice. As soon as the default came to the knowledge of the beneficiaries, and long before the death of Mr. Aroni, the parties immediately tendered payment of all assessments due and demanded the reinstatement of Mr. Aroni, which was refused.

We, therefore, accept and treat it as a fact in the case that Mr. Aroni was not notified of any assessment which he failed to pay, unless the simple posting in the Exchange operated as a sufficient notice.

The learned counsel for defendant vigorously maintain that Mr. Aroni was entitled to no other notice than the posting; that the charter is a contract to which he was a party, and by the terms of which he is bound, and that he had not, and no action of the officers of the company could confer upon him, a right to any other notice than that which the charter declared should be sufficient.

We can discover no possible reason why the defendant should be exempt from the application of the principles of equitable estoppel which operate upon all other persons natural or juridical, nor why the mere fact that there was a contract should bar their application.

In matters affecting the execution of contracts, there would never be any occasion for invoking the doctrine of estoppel if the party had complied with the terms of his contract, because such compliance would be, of itself, a sufficient basis for his legal right.

It is only when the terms have admittedly not been complied with, that the question arises whether the other party has, by his representations or conduct, estopped himself from setting up each non-compliance as a ground of forfeiture.

Says Mr. Bigelow: "Where a person, by his words or conduct, voluntarily causes another to believe in the existence of a certain state of things and induces him to act upon that belief, so as to change his previous position, he will be estopped to aver against the latter a different state of things." Bigelow on Estoppel, Introd'n, p. 64.

There can be no doubt that the long continued practice of the de-

fendant company to send to Mr. Aroni prompt notice of every assessment as soon as made, justified him in believing that he would receive such notices, and in acting on the belief that, by paying when so notified, his rights would be protected.

The case is very much stronger than that of ordinary insurance, where a fixed premium is due at a date certain and where the insured, independently of any notice, is fully advised of his duty in the premises. Here notice of some kind was absolutely essential in order to inform the insured that anything was due. But even in the former class of cases, it has been universally held that, however positive the terms of the contract in requiring payment, unconditionally, of the premiums when due, yet if the company pursues the practice of notifying its policy-holder before the maturity of his premiums, the latter would have the right to expect and to rely on receiving such notice, and that if the company failed to send it in a particular case it would be estopped from claiming a forfeiture for non-payment at the exact time.

This has been held by the Supreme Court of the United States, using the following language: "Forfeitures are not favored in the law; and courts are always prompt to seize hold of any circumstances that indicate an election to waive a forfeiture or an agreement to do so on which the party has relied and acted. Any agreement, declaration or course of action, on the part of an insurance company, which leads a party insured honestly to believe that, by conforming thereto, a forfeiture of his policy will not be incurred, followed by due conformity on his part, will and ought to estop the company from insisting on the forfeiture, though it might be claimed under the express letter of the contract. The company is thereby estopped from enforcing the contract. * * In the present case it appeared that the company had discontinued its agency at the place of residence of the insured soon after the policy was issued and had given him notice by mail, from time to time, where and to whom to pay them. Such notice, it would seem, had never been omitted prior to the maturity of the last instalment. The effect of the judge's charge was, that if this was the fact, and if no notice had been given on that occasion, and the failure to pay the premium was solely due to the want of such notice, it being ready and being tendered as soon as notice was given, no forfeiture was incurred. We think the charge was correct under the circumstances of this case. The insured had good reason to expect and to rely on receiving notice to whom and where he should pay that in-

stalment. It had always been given before, etc." Insurance Co. vs. Eggleston, 96 U. S., 572.

The same doctrine was reiterated in a later case, and was extended to a case where the insurance company was in the habit of receiving the premium though tendered a few days after maturity, and was held to be thereby estopped from claiming a forfeiture when the premium was tendered in a reasonable time after maturity. Ins. Co. vs. Doster, 106 U. S. 30; see also Ins. Co. vs. Pierce, 75 Ill. 426; Attorney General vs. Ins. Co. 33 Hun. (N. Y.) 138; Ins. Co. vs. Tullidge, 39 Ohio· St. 240; Ins. Co. vs. Smith, 44 Id. 156; Thompson vs. Ins. Co., 52 Mo. 469; Fitzpatrick vs. Ins. Co., 25 La. 444.

The case last quoted fully, recognizes the authority of a mutual benefit association, like the defendant, to change the method of notice provided in the charter and held the company estopped from setting· up a forfeiture under the charter notice, where the new notice adopted had not been given.

We consider the present case as fully covered by the principles. above set forth.

Judgment affirmed.