PRO VO STY, J.
As a means of increasing the sale of its beer, the plaintiff company rents the premises No. 437 St. Charles street, in this city, and subleases them for a beer saloon. In September, 1906, the defendant bought out the former sublessee, and became the sublessee of the plaintiff. The price of the transfer to defendant was $8,500. Of this, about $8,000 was for the good will of the place, and about $500 for the movables on the premises — the bar fixtures, etc., and some goods of little value. Plaintiff and defendant signed a new lease for a term of five years. It stipulated that the premises were not to be used for anything else than for a saloon, and all the draught beer and 75 per cent, of the locally bottled beer to be sold on the premises were to be of plaintiff’s beer. It is contended that, although perhaps plaintiff has lived up to the letter of his contract, he has violated its spirit. The contract, as already stated, was entered into in September, 1906. In June following the defendant became the New Orleans agent of the Lemps’ St. Louis beer. This the plaintiff did not relish. Its president, Mr. Wirth, told defendant that defendant could not serve two masters at once. A few days before the present suit was brought, the defendant had taken down from the front of his saloon the signs of the plaintiff company, which theretofore he had kept there for advertising plaintiff’s beer. This suit was filed in September, 1907, one year after the date of the contract. Mr. Wirth, the president of the plaintiff company, testified that in this year defendant had bought only $33 of plaintiff’s bottled beer; and that the bottled beer sold by defendant during this time had been Lemps’; that as agent' for the Lemps Company the defendant sold beer at wholesale to the different customers of plaintiff, and sold the same beer at two other drinking establishments of his own; that he saw defendant “loading up the Lemps beer from the leased premises, taking cases out, and making a warehouse and beer depot of the premises; that he called for his company’s bottled beer at defendant’s saloon, and none was on hand; that defendant’s purchases of keg beer decreased continually, except during the month immediately preceding the filing of the suit, decreasing from 82 barrels for the *938 first month to 42 barrels in. May, and 39 in July, and increasing to 48 in August; that he (meaning his company) would not have paid $7,000 for the lease of the place if he had known that defendant was going to sell other beer than that of his company. A report came to the witness, it seems, that defendant had boasted of the increase in his business since he had Lemps’ beer in his place, and this nettled the witness.
This was the situation, when, on the 6th of September, 1907, after the contract had been going on one year, Mr. Wirth learned that defendant had not paid his rent note falling due on the first of the month, and that defendant’s keg beer bill for the preceding month, payable on the 25th of the month just expired, ■ and amounting to $257.40 for the saloon on the leased premises and $72.60 for defendant’s other'saloon, had not been paid; and thereupon, without demanding of defendant the payment of the rent, or otherwise warning him, he caused this suit to be instituted.
The suit is for dissolution of the lease, and is accompanied by provisional seizure for the amount of the rent past due, and for such amount as may accrue until the possession of the leased premises is returned. The allegations are that defendant has defaulted in the payment of his rent, and has violated the contract by selling other draught beer than plaintiff’s and by not letting 75 per cent, of his sales of local bottled beer be of plaintiff’s beer.
Defendant at once offered to pay the rent, and let the lease continue, but plaintiff would not agree to this. For the purpose of showing that the moving cause of the suit was not plaintiff’s fear of losing its rent, but simply plaintiff’s offense at his being agent for and selling Lemps’ beer, defendant offered to prove that Mr. Wirth, in an interview with him after the seizure, was very angry in his manner. But, on objection, the court ruled that while the words used on that occasion by Mr. Wirth could be repeated his manner could not be described. We think this was error, and we shall assume that this animosity of Mr. Wirth would have been shown if the testimony had been allowed, although further evidence of it than- what sticks out of the entire testimony of Mr. Wirth is really quite superfluous.
There is no longer any contention that defendant sold any other draught beer than defendant’s or sold a single bottle of local beer other than plaintiff’s, and there is not a word in the contract against defendant’s becoming agent for Lemps’ or any other beer, or against his confining his sale of bottled beer to Lemps’ or other bottled beer not of local manufacture. Defendant explains that the reason of his not selling plaintiff’s bottled beer was that his customers were mainly theatrical people, and theater frequenters familiar with the best-known brands of the country, who, when wanting bottled beer, would call for these brands, and not for plaintiff’s, and when wanting plaintiff’s beer would prefer to pay 5 cents for the draught beer than 15 ■ cents for the bottled; and that for that reason he found that it did not pay to keep plaintiff’s bottled beer on ice. Defendant also explains how the signs of the plaintiff company came to be removed. He says that one of them was broken and he ordered some workmen to take it down, to be replaced later on by a new one, and that the workmen, by mistake, took down both signs. This excuse, we must say, appears rather lame, but defendant testifies to it, and we give it as we find it in the record.
Mr. Wirth would make out that he was led to bring this suit and sue out the provisional seizure from fear of losing his rent; but we cannot escape the conclusion from the record that if it had not been for defendant’s connection with the Lemps beer this suit would never have been brought. Defendant had bought from plaintiff $4,900 of beer in the preceding 10 months, and he had theretofore *940 been slow in. bis payments, and plaintiff had in no way become alarmed. Mr. Wirth would have it that he was in great part influenced by the fact that in addition to the rent, defendant owed a debt of $100 for an ice box, and also a note for $233, both of which were long past due; and the company’s collector had called at defendant’s place for the payment of these debts on the 25th of August and several times on the days following and had not found defendant in, and, finally, when he did meet defendant, had been put off to the 5th of September, and that on the latter day defendant had admitted his uneasiness. But 'defendant had had occasion to ask indulgence in the past and nothing had been thought of it. . Mr. Wirth knew that the property of defendant on the leased premises was hardly worth the amount of the debt of defendant, while the good will of the place was worth several thousand dollars. He says he did not know how much defendant had paid for this good will, but that he knew it was worth not less than $4,000. As already stated, defendant had paid $8,000 for it; and defendant testifies it was worth that much at the date of the seizure. Under these circumstances, Mr. Wirth could not but have known that defendant was in no position to defeat the lessor’s claim by running off the movables from the leased premises. The movables were worth at most $1,000, and by running them off defendant would have destroyed a good will acquired at a price of $8,000, and worth that much, and which Mr. Wirth admits he knew was worth at least $4,000.
. Plaintiff relies on the strictly technical ground that failure to pay rent on the day it is due puts an end to the lease, and such is ordinarily the rule; but such rule, cannot have application in a case like this where the lessor has by his conduct led the tenant to believe that a delay of a few days would make no difference. Mr. Wirth could not but have known that had defendant had the least suspicion that the payment of the rent to the day was of any importance, he would have taken no risk in the matter. A course of business had been established between the parties. The rent notes of $200 each, were payable on the first of each month. Ten or twelve days before the first of each month, the bank, in which the notes were deposited for collection, would give the usual notice to defendant, and, a few days after the first, defendant would pay the note. The note for November was paid on December, 7th; that for December, on January 3d; that of January, on February 5th; that of February, on March 8th; that of March, on April 4th; that of April, on May 5th; that of May, on June 5th; that of June, on July 9th; that of July, on August 13th. Because, then, the note of August had not been paid on September 6th it could not have given plaintiff any great cause for alarm. Having established this course of business, plaintiff was no longer in a position to say that the mere failure to meet the payment to the day abrogated the contract, and justified a provisional seizure.
Plaintiff could not but have known that a peremptory demand without suit would have been entirely effective. The lessee cannot claim of right any delay for the payment of his rent, and the court cannot grant him any; but at least must he know that absolute punctuality of payment is expected of him and will be insisted on. Where, by the conduct of the lessor, he is led to suppose the contrary, he cannot be said to be in fault if he allows an insignificant delay to elapse. He has, then, reason to believe that the slight delay is not objected to by the lessor.
The principle which comes into play in such a case is the same which has been applied in the law of life insurance, and which is expressed in the case of Gunther v. Mutual Aid Association, 40 La. Ann. 776, 5 South. 65, 2 L. R. A. 118, 8 Am. St. Rep. 554, as follows:
“In matters affecting the execution of contracts there would never be any occasion for invoking the doctrine of estoppel if the party had complied with the terms of his contract, *942 because such compliance would be of itself a sufficient basis for his legal right.
“It is only when the terms have admittedly not been complied with that the question arises whether the other party has, by his representations and conduct, estopped himself from setting up such noncompliance as a ground of forfeiture. * * *
“It has been .held universally that, however positive the terms of the contract in requiring payment unconditionally of the premiums when due, yet, if the company pursues the practice of notifying its policy holder before the maturity of its premiums, the latter would have the right to expect and to rely on receiving such notice, and that, if the company failed to send it in a particular case, it would be estopped from claiming a forfeiture for nonpayment at the exact time.”
This court has not heretofore had occasion to apply this principle in any case of lease; but the Court of Appeal for the parish of Orleans has had occasion to do so. In the case of Bacas v. Mandot, 3 Court of Appeal, 324, said court said:
“When a lessor, month after month, has, without objection or protest, accepted the rental a few days after the maturity of the notes, he cannot, without previous notice to his tenant, claim a forfeiture of the lease.”
We concur in these views. The punctuality required of the lessee in the payment of his rent has been designed solely for the protection of the lessor, and cannot be allowed to be converted in his hands into a means of entrapping and oppressing the lessee.
The lower court dismissed plaintiff’s suit and dissolved the provisional seizure.
The judgment is affirmed, with reserve to defendant of whatever right he may have to sue for damages.