## CLARK v. MUTUAL BEN. HEALTH & ACCIDENT ASS'N.

### No. 1124.

Court of Appeal of Louisiana. First Circuit.

March 7, 1933.

McCoy, Moss & King, of Lake Charles, for appellant.

C. A. Blanchard, of Morgan City, for appellee.

ELLIOTT, Judge.

Mrs. Anna Gaudet Clark, widow of James Borden Clark, claims of Mutual Benefit Health & Accident Association the sum of $400 on a health insurance policy taken out by James Borden Clark payable to himself, at the rate of $200 per month. She alleges that on December 6, 1930, he took sick and on March 28, 1931, he departed this life. That during the interval between January 24, 1931, to March 28, 1931, he was confined to his bed by sickness totally incapacitated, and that said confinement and incapacity resulted in total loss of time.

That there is error on the part of the physicians, Dr. White and Dr. Slaughter, as to the date of the first treatment given her husband. That she offered to correct the error and that defendant refuses to allow the correction and refuses to pay the policy.

She claims the further sum of $400 as a double indemnity and also the sum of $125 as attorney's fees under Act No. 310 of 1910.

The policy is annexed to and made part of the petition, and she claims to be the sole beneficiary thereunder.

Defendant, answering, admits the issuance of the policy, but denies that it was in force or effect at the time her husband became disabled by illness to such an extent as to compel him to quit work or to entitle him to indemnity for loss of time. It further alleges that the policy in question was forfeited on November 1, 1930, on account of the nonpayment of the premium due at that time. That on November 13, 1930, it was reinstated by payment of the delinquent premium. That the illness that resulted in her husband's confinement existed prior to its reinstatement and that it is therefore not responsible to plaintiff on said account.

There was judgment in favor of the plaintiff for $400 with interest, and the fees of the doctors called as experts were taxed at $10 each, but her demand for double indemnity and for attorney's fees was refused.

Defendant has appealed. The briefs on both sides discuss the provisions of Acts No. 97 of 1908, No. 227 of 1916, and No. 310 of 1910. The plaintiff contends that they have bearing supporting her demand. Defendant contends that her demand is not within their provisions.

The policy sued on is based on the health of James Borden Clark and issued without medical examination. It was forfeited on November 1, 1930, for nonpayment of premium but was reinstated without medical examination on November 13, 1930. Assured died on March 28, 1931. Therefore the Act No. 97 of 1908 providing for health insurance without a medical examination is the governing law on the subject as it stood previous to the amending Act No. 195 of 1932. As for representations on the part of the assured in obtaining the policy on the subject of his health, we have no knowledge except as indicated by his answers on the typewritten copy of his application for the insurance attached to the policy. By reference thereto it appears that, applying for the policy, he answered every question concerning his health by saying that he had no disease.

But his answers to questions in applying for the policy and to any that may have been asked him on November 13, 1930, at the time of remitting the delinquent premium is not a matter of concern, because it is not alleged in the answer, nor contended for by the offer of evidence, that the assured made any untruthful statements, either in obtaining the policy or in procuring its reinstatement. Consequently the provisions of Act No. 97 of 1908 is not a matter of controversy and a statement of the law on the subject would serve no purpose.

As for Act No. 227 of 1916, it is restricted in its effect to life insurance policies. It therefore does not, strictly speaking, apply to this policy, but there is so much analogy in purpose and object between the provisions of these two acts that cases dealing with policies coming under Act No. 97 of 1908 are cited as bearing on the provisions of Act No. 227 of 1916, and cases coming under the provisions of Act No. 227 of 1916 are cited as bearing on the provisions of Act No. 97 of 1908. But in the present case the real difference between the parties and the proper decision of the case depends on the proper construction and enforcement of the stipulations in the policy, designated as part K, under the heading "Illness Indemnities," and another under the designation "Standard Provisions No. 3."

It is conceded that the policy in question lapsed on November 1, 1930, on account of the nonpayment of the monthly premium due at that time and remained without force or effect until November 13, 1930, when by the payment of the delinquent premium it was restored and put back into force and effect again.

On the question of error said by plaintiff to have been made in the statements of physicians concerning the date they were first consulted by her husband, in answering questions asked on forms furnished by defendant for the purpose of enabling the assured during his sickness to apply for the insurance claimed by his widow in the present case, the record contains a letter written by the assured to defendant bearing date January 30, 1931, in which he says:

"Gentlemen, I am sick in bed and wish you would send me the necessary blanks of forms to report same.

"Yours truly    [Signed]    J. B. Clark."

There would be no reason to misstate the date, so we take it that his application for forms for the purpose is correctly dated.

Dr. White, in filling out a blank for this purpose on February 6, 1931, states that he was first consulted by assured on November 20, 1930; but in his testimony taken in open court on the trial of the case he testified that upon consulting his records he found that the date was December 6, 1930.

We are satisfied that it was on December 6, 1930, that Dr. White was first consulted.

The assured, Clark, also filled out a blank for the same purpose on February 6, 1931, and states that it was on November 20th that he first consulted a physician; but he subsequently signed another affidavit in which he says that it was on December 6, 1930, that he first consulted a physician.

Mrs. Clark testifies that it was on December 6, 1930, that her husband first consulted Dr. White.

Dr. Slaughter, in answering questions on a form furnished by defendant for the purpose on May 21, 1931, says that he was first called to attend assured about November 20, 1930.

The testimony of Dr. Slaughter was also taken by commission and used on the trial of the case. In his testimony taken for that purpose he was asked:

"Q. Did you have an occasion to make a physical examination of said James Borden Clark on or about November 20, 1930? A. I think that it was November 20, 1930. I am not absolutely positive as to the day of the month, but I know that it was in November 1930."

Mrs. Clark testifies that she accompanied her husband to the office of Dr. White and that it was on December 6, 1930; that he consulted Dr. White before he went to Bogalousa and there consulted Dr. Slaughter. Dr. White says that after assured had consulted him, he advised him to go to bed, etc., but that assured informed him that he must first attend to some business; that he went away and was absent for some time, then returned and went to bed.

Dr. Slaughter, in answering an interrogatory:

"Q. State whether or not Mr. Clark told you he had been suffering from dizziness and weakness prior to and at the time you made an examination of him on or about November 20, 1930? A. Yes. The way Mr. Clark's blood

pressure came to be taken was this. He came to see me on business and after our business had been transacted he asked me to check him over as it had been some time since I had examined him. During the course of the examination his blood pressure was found to be as stated above."

We are inclined to the view that Dr. Slaughter was mistaken as to the date he examined the assured and found him with high blood pressure. We think it was likely after he had been examined by Dr. White, and that it was more probably on or about December 20, 1930, than November 20, 1930.

Dr. White testified in open court on the trial of the case that Mr. Clark came to his office December 6, 1930, and wished to be examined on account of his health; that he asked Mr. Clark if there were any particular symptoms, and he said no more than that he felt weak and bad at times and suffered from dizziness. That Mr. Clark was then found to have, not only high blood pressure, which he considered dangerous, but his urine contained a very high percentage of albumen; that he made a diagnosis of nephritis. That Mr. Clark in addition had bad teeth. He advised him to have them removed and to take a rest of not less than two months and go to bed and go on a diet. He further said: "I think he told me at the time, he could not go to bed as he had some business he had to finish up. I told him he was tampering with his life. It seems to me he went off to some place and attended to some affairs and came back, I think, some time in January, probably around the middle of January, and did go to bed and take a rest cure. * * * I went to see him on one or two occasions and found him in a very bad condition. And he came to see me at the office once or twice." Further testifying, he says that Mr. Clark had all his teeth pulled at one time, which resulted in an immediate infection of the heart sac; that he suffered great pain, it was hard for him to get his breath, his pulse was rapid, and he suffered great prostration. They (meaning Clark's family) called in Dr. Arceneaux. That Dr. Arceneaux told him (White) to meet him in consultation, and that Mr. Clark died from heart complications within two or three hours after that. That the infection was caused by his teeth. That high blood pressure is not a disease; it is supposed to be due to hardening of the arteries and to be the outward effect of some other disease. He gave it as his opinion that the high blood pressure with which Mr. Clark suffered was caused by the condition of his kidneys; that his diseased condition had existed for a period of two or three months before he came to see him. That his condition had not developed overnight, but was progressive. That during the time from January 24, 1931, to March 28, 1931, he visited Mr. Clark. That during this time Mr. Clark was confined to his bed taking a rest cure and was totally incapacitated. That he was incapacitated from the first time he saw him, which was on December 6, 1930, and that he should have been in bed then.

The testimony of Dr. Slaughter taken for the purpose of the trial is about the same, except that he did not speak of finding any kidney disease.

There is further testimony in the record to the effect that Mr. Clark went to bed on January 24, 1931, and was confined to bed and was totally incapacitated until March 28, 1931, when he died.

■ The above is the substance of the testimony showing when Mr. Clark first consulted a physician and when he was first found to be sick, but the date on which he first consulted a physician and was first found to be seriously sick is not the ground on which we will rest our decision of the case. It will be based instead on the stipulations contained in the policy. The policy contains under the designation "Part K—Illness Indemnities," and under "Standard Provisions No. 3." stipulations which are as between the parties the law of the case. Civ. Code, arts. 1901 and 1945.

■ The stipulation designated as "Part K" under the heading, "Illness Indemnities Confining Illness," $200 per month for life. "The Association will pay indemnities at the rate of two hundred ($200.00) dollars per month beginning with the fourth day after medical treatment and confinement for disability resulting from disease, the cause of which originates more than thirty days after the date of this policy and which necessarily confines the Insured continuously within doors and requires regular visits therein by a legally qualified physician, provided said disease necessitates total disability and total loss of time."

Under the designation "Standard Provisions No. 3" it is said: "If default be made in the payment of the agreed premium for this policy, the subsequent acceptance of the premium by the Association or of any of its duly authorized agents shall reinstate the policy, but only to cover accidental injury thereafter sustained and such sickness as may begin more than ten days after the date of such acceptance."

We think that the ten-day period after the word "sickness," used in paragraph 3, has reference to the beginning of the confinement of the kind provided for under part K, which necessarily confines the insured continuously within doors and requires regular visits therein by a legally qualified physician, and which disease necessitates total disability and total loss of time.

We think this interpretation of the meaning of the policy, under which Clark was insured, is indicated by the language used in part L, designated as "Nonconfining Illness,"

$100 per month. This provision says: "The Association will pay indemnity at the rate of One Hundred ($100.00) dollars per month, beginning with the fourth day after medical treatment and total disability, but not exceeding six months for disability resulting from disease, the cause of which originates more than thirty days after the date of this policy, and which does not necessarily confine the Insured continuously within doors, but requires regular medical attention, provided said disease necessitates total disability and total loss of time. If three days have been eliminated in Part K, benefit then begins on first day of non-confining illness."

Insurance under part K provides for indemnity against disability as a result of sickness which necessarily confines continuously within doors and requires regular visits therein by a legally qualified physician and necessitates total disability and total loss of time, the commencement of which is ten days after the beginning of such confinement.

Insurance under part L provides for sickness which does not necessarily confine within doors, etc.

This interpretation of the policy is supported by the questions asked on the forms which, as we understand, were sent to be filled out in response to Clark's letter requesting that it be done to enable him to' make proof of his claim to the insurance in question.

The form filled out by Clark contains the following questions:

"Q. When did you quit work entirely? A. January 23rd 1931.

"Q. When were you first confined to the house all day? A. January 24th 1931.

"Q. When were you first confined to your bed all day? A. January 24th 1931."

These questions had reference to Clark's claim for $200 per month under part K and Standard Provisions No. 3.

The sickness with which Clark suffered began more than ten days prior to November 13, 1930, which was the day on which the policy was reinstated and put back into force and effect.

But the sickness which necessarily confined him continuously within doors and to his bed· and required regular visits of a physician therein, and which necessitated total disability and total loss of time, commenced, under the evidence, more than ten days after the policy was reinstated. We therefore hold that plaintiff is entitled to recover the $200 per month during which time he was so confined.

The judge a quo reasons out plaintiff's right to recover, in some respects, as we do, and partly on other grounds; but we come to the same conclusion.

The interpretation we make of the policy is in harmony with Taylor v. Latin-American Life & Casualty Ins. Co., 152 La. 740, 94 So. 375. The case of Gunther v. N. O. C. E. Mutual Aid Association, 40 La. Ann. 776, 5 So. 65, 2 L. R. A. 118, 8 Am. St. Rep. 554, contains nothing to the contrary because the decision is based on different grounds.

In the case Richardson v. American National Insurance Co., 18 La. App. 468, 137 So. 370, the court, considering a situation similar to the present, said that the doctrine of Taylor v. Latin-American Life & Cas. Insurance Co. was followed unanimously by the courts of all American jurisdictions. Citing a list of cases to which we have not access.

■ The plaintiff has filed an answer to' the appeal and prays that the judgment appealed from be amended so as to allow her the double indemnity and attorney's fees provided for by Act No. 310 of 1910.

Sections 2 and 3 of this act provide that insurance companies need not pay double indemnity nor attorney's fees when just and reasonable grounds exist such as put a reasonable and prudent business man on his guard for delay in the matter of payment. We find that such grounds exist in this case.

The judgment appealed from is affirmed. Defendant and appellant to pay the cost in both courts.