387 So.2d 693 (1980)
HOUSING AUTHORITY OF CITY OF ABBEVILLE, Plaintiff-Appellee,
v.
Raymond HEBERT, Defendant-Appellant.
No. 7739.
Court of Appeal of Louisiana, Third Circuit.
July 31, 1980.
Rehearing Denied September 19, 1980.
*694 Louis G. Garrot, III, Abbeville, for defendant-appellant.
Carrol L. Spell, Jr., Abbeville, for plaintiff-appellee.
Before FORET, STOKER and LABORDE, JJ.
FORET, Judge.
This is an eviction case. Defendant, Raymond Hebert, appeals from a judgment of the City Court of Abbeville, Louisiana, ordering defendant to remove all animals from the leased premises within twenty-four hours of the service of said judgment, and in default thereof, to vacate the premises.
The issues presented are:
(1) Had plaintiff acquiesced in the violation of the lease, and
(2) Did plaintiff abuse the right granted it under the lease.

MERITS
On August 7, 1979, a notice of eviction was delivered to defendant alleging that he had breached applicable provisions of the lease by:
(A) keeping pets, more specifically, dogs;
(B) failing to keep the premises in a clean and sanitary condition, and failing to maintain the yard in a neat and orderly manner; and
(C) engaging in practices that endanger and disturb other project tenants.
Sections 1(e) and 1(f) of the lease provide:
"* * *
(e) To comply with all City Ordinances to keep the premises in clean and sanitary condition; to maintain the yard in the front and rear of his dwelling in neat and orderly manner; not to use the premises for any illegal or immoral purposes or for any other purpose than herein contemplated; not to make any repairs or alterations without the written consent of the Management; not to place anything in the premises or use the premises in any manner which might in any respect forfeit the insurance of the premises or increase the rate thereof; not to display any signs whatsoever, not to keep pets of any kind. Not to use tacks, nails or screws or other fasteners in any part of the premises except in a manner prescribed by the Management; not to install window fans, air conditioners or aerials without a permit from the Manager and to notify the Management promptly of the need of any repairs to the premises.

*695 (f) To follow all rules or regulations prescribed by the Management including particularly, but not limited to, those contained in the Tenant Handbook concerning the use and care of the premises and of any common or community space in the "Development" including stair halls, walks, drives, playgrounds, community rooms, and to follow all rules and regulations with reference to your obligations as a tenant in relation to the community as a whole; you and all members of your family are prohibited from committing any form of vandalism and also are prohibited from any practices that will endanger or disturb other project residents, such as playing baseball and other dangerous games in the project courts, etc.
* * *"
Ground "B", failing to keep the premises clean, was abandoned by plaintiff. Ground "C" is based upon activities of the defendant's minor son. Allegedly the boy had fights with other children thereby "engaging in practices that endanger and disturb other project tenants". After a review of the lease, we conclude, as did the trial court, that this conduct is not the type of prohibited activity contemplated by the terms thereof.
This leaves us addressing only "A", the keeping of pets on the premises.
It is undisputed that defendant kept a pet on the leased premises for a period in excess of three years. The record shows that pets were kept by several residents of the housing project, and that this violation of the lease was seemingly condoned by virtue of the inaction of the Abbeville Housing Authority for over twenty years. On May 4, 1979, however, a notice was circulated to all tenants, including defendant, notifying them that the keeping of pets on the project premises would no longer be allowed. This notice gave the occupants owning pets thirty days to relocate or dispose of same. Defendant failed to comply with the notice and eviction proceedings were instituted, whereupon the trial court rendered judgment in favor of plaintiff, stating:
"Defendants shall remove all animals from the premises within 24 hours or in default thereof the Marshall shall have them vacate the premises. I therefore, leave the decision of whether or not the defendant will have adequate housing for his family in his control."
Defendant argues that the acquiescence by the Housing Authority in allowing the keeping of pets on the project premises over a number of years would tend to bar them from enforcing a written prohibition in the lease. We tend to agree with this argument, absent any other extenuating circumstances.
Counsel for defendant relies on the case of Lee Lumber Company, Ltd. v. International Paper Company, 345 So.2d 212 (La. App. 3 Cir. 1977), certiorari denied, 347 So.2d 503 (La.1977), as supporting his theory that plaintiff is estopped from enforcing a provision of a lease where the violation of that provision was sought to be strictly enforced when the lessor had acquiesced in said violation. In Lee, however, there had been no notice to the lessee that the violated provision would henceforth be strictly enforced.
There is a presumption that each party to every contract has agreed to confer on the other the right to resort to the judicial machinery of the state in order to enforce the performance of the agreement unless the contrary be expressed or implied. LSA-C.C. Article 1799. Although plaintiff may have tacitly approved of the keeping of pets in the project, this approval cannot be construed, under the facts presented here, to have vitiated the right granted by Civil Code Article 1799.
Vital to the formation of a contract or to the modification thereof is the concurrence of the consent of the parties which consent must be freely given. LSA-C.C. Articles 1766, 1779(2), 1798, and 1800. There must be a free and deliberate exercise of the will together with the consent of the parties, which consent must be expressed or implied. LSA-C.C. Articles 1780, 1811, 1819. Consent may be deemed implied:

*696 ". . . when it is manifested by actions, even by silence or inaction, in cases in which they can from the circumstances be supposed to mean, or by legal presumption are directed to be considered as evidence of an assent."
LSA-C.C. Article 1811.
This consent, however, is implied only in cases which are particularly determined by law. LSA-C.C. Article 1781. The silence of an offeree alone, therefore, should not, in principle, be considered as involving acceptance on his part. His consent can result from his silence or inaction, however, when combined with surrounding circumstances imply or indicate his consent unequivocably. 1 Civil Law Translations-Aubry & Rau, Obligations, § 343, pg. 307 (1965); Illinois Central Gulf Railroad Company v. International Harvester Company, 368 So.2d 1009 (La. 1979). Where the law does not expressly create a legal presumption of consent from certain facts, the determination of the existence of consent is left to the discretion of the judge. LSA-C.C. Article 1818.
Our Civil Code and statutes do not provide that any legal presumption arises from a lessor's permitting a lessee to keep pets in violation of a lease by virtue of the former's silence. Therefore, the trial judge was correct in finding that plaintiff could properly enforce the term of the lease treating the keeping of pets inasmuch as the silence or inaction of the Housing Authority could not be construed as condoning this practice.
Significant in our conclusion is the fact that defendant was given notice thirty days prior to the date that the lease provision would begin being strictly enforced.
An analogous situation arises when a lessor continually accepts the late payment of rent. There is a well established rule in our jurisprudence that when a lessor-owner customarily accepts late rental payments, such "custom" has the effect of altering the lease contract with respect to punctuality of rent payments. Himbola Manor Apartments v. Allen, 315 So.2d 790 (La.App. 3 Cir. 1975); Briede v. Babst, 131 La. 159, 59 So. 106 (1912); Standard Brewing Co. v. Anderson, 121 La. 935, 46 So. 926 (1908); Rex Credit Co. v. Kirsch, 4 So.2d 797 (La.App. Orl. Cir. 1941).
This rule is based on the equitable consideration that to allow the lessor-owner to accept late payments thereby "misleading or lulling the tenant into a false sense of security" and then arbitrarily demanding timely payment of the rent would be unfair.
This rule, however, does not apply to a situation where a lessor-owner notifies the lessee of his intention to strictly enforce a contract well in advance of the time that the enforcement is to take place. In this case, Hebert was given thirty days, and an additional twenty-four hours after the service of the judgment, within which to remove the pet. We think that the defendant had ample opportunity to remedy the situation.
Defendant's counsel asserts that the lessor was guilty of abusing the rights it held pursuant to the lease.
The doctrine of abuse of rights has done relatively unused in Louisiana. In an excellent treatment[1] of this legal principle, Professor Cueto-Rua observes:
"* * * The doctrine of abuse of rights is in the making, it is `in fieri.' It is an important juridical-political element of modern civil law doctrine. Although there are still pending important questions concerning its scope as well as criteria for the definition of abusive use of rights, this we may safely say now: it will be difficult for a holder of an individual right, in most of the civil law jurisdictions today, to exercise such right to the detriment of other parties, just for the sheer sake of exercising it. At least a `serious and legitimate interest' will have to be shown in order to justify the exercise of its right."
In Illinois Central Gulf Railroad Company v. International Harvester Company, supra, our Supreme Court dealt extensively with this doctrine, stating:

*697 "This Court expressly recognized the doctrine of abuse of rights in Morse v. J. Ray McDermott & Co., Inc., 344 So.2d 1353 (La.1977), and has employed a similar analysis in earlier decisions. Higgins Oil & Fuel Co. v. Guaranty Oil Co., 145 La. 233, 82 So. 206 (1919); Onorato v. Maestri, 173 La. 375, 137 So. 67 (1931).
Nevertheless, the doctrine of abuse of rights has been invoked sparingly in Louisiana and we must look to other civilian jurisdictions for its full articulation. The doctrine is the product of a French jurisprudential and doctrinal movement which has expanded into most of the civil law jurisdictions "to the point of becoming a widely accepted principle of the Civil Law." Cueto-Rua, Abuse of Rights, 35 La.L.Rev. 965, 967 (1975). See, generally, Catala and Weir, Delict and Torts: A Study in Parallel (Part II), 38 Tul.L.Rev. 221 (1964); Herman, Classical Social Theories and the Doctrine of Abuse of Right, 37 La.L.Rev. 747 (1977); Maynard, Abuse of Rights in France and Quebec, 34 La.L. Rev. 993 (1974); Comment, 7 Tul.L.Rev. 426 (1933). The main body of French case law on abuse of rights is based on article 1382 of the French Civil Code, which is very similar in wording to article 2315 of the Louisiana Civil Code. In its origin, the abuse of rights doctrine was applied to prevent the holder of rights or powers from exercising those rights exclusively for the purpose of harming another, but today most courts in civil law jurisdictions will find an act abusive if the predominant motive for it was to cause harm. See, Cueto-Rua, supra, at 990-91; Catala and Weir, supra, at 222-26. The doctrine has been applied where an intent to harm was not proven, if it was shown that there was no serious and legitimate interest in the exercise of the right worthy of judicial protection. See, Cueto-Rua, supra, at 992-96; Catala and Weir, supra, at 230-34. Protection or enforcement of a right has been denied when the exercise of the right is against moral rules, good faith or elementary fairness. See, Cueto-Rua, supra, at 996-99. Another criteria, espoused originally by the French scholar Louis Josserand, would require an examination of the purpose for which the right was granted. If the holder of the right exercised the right for a purpose other than that for which the right was granted, then he may have abused the right. See, Cueto-Rua, supra, at 1000-1003; Catala and Weir, supra, at 227-29; Herman, supra, at 754-55."
Thus, the main criteria for applying the abuse of rights doctrine are:
(1) The exercising of rights exclusively for the purpose of harming another or if the predominant motive is to cause harm;
(2) The non-existence of a serious and legitimate interest that is worthy of judicial protection;
(3) The right has been used in violation of moral rules, good faith, or elementary fairness, or
(4) The holder of the right exercised the right for a purpose other than for which the right was granted.
Our review of the conduct of all parties in light of the foregoing jurisprudence and learned writings reveals nothing which would sanction the application of the doctrine of abuse of rights.
Therefore, the judgment of the trial court is affirmed. All costs of these proceedings are assessed against appellant.
AFFIRMED.
NOTES
[1] Cueto-Rua, Abuse of Rights, 35 La.Law Rev. 965 (1975).