SAM CROWELL, Plaintiff, v. CHARLES J. COHEN and Others, Copartners, Doing Business as COHEN, SIMONSON & Co., Defendants.

Municipal Court of New York, Borough of Manhattan, Third District, January 4, 1934.

*Joseph Rolnick*, for the plaintiff.

*George Lion Cohen*, for the defendants.

LEWIS, DAVID C., J. On May 31, 1933, the plaintiff, as a customer, opened a trading account with the defendants, members of the New York Stock Exchange, as brokers.

At that time the plaintiff executed a defendants' form letter called "Customers Contract." In this writing we find, among various provisions, the following: "You [meaning the brokers] shall have the right whenever in your absolute and unrestricted discretion you consider it necessary for your own protection, to sell all or any of my securities and commodities, to buy any or all securities and commodities of which I may be short, and to close any or all outstanding contracts, all without demand for margin or additional margin, notice of sale or purchase, or other notice of advertisement, even though demands for margin or notice of sale or purchase were given or attempted to be given to me in one or more instances prior thereto, or in the same instance. The sale or purchase may be made on any exchange or market or at public or private sale at such times and places as you may deem best; you may be the purchasers for your own account in case of public sale by auction or on any exchange."

Thereafter the plaintiff deposited certain margin with the defendants and the defendants executed certain orders for him, and on July 18, 1933, the plaintiff's account showed certain shares of stock purchased and acquired by the defendants for him, and held by them as collateral, pursuant to the terms of the so-called customers' contract.

Out of these transactions there grew a dual or twin born relationship: In the execution of an order the customer was the principal and the brokers his agents; and upon the brokers' receipt of the stock purchased, the brokers became pledgees and the customer became the pledgor.

Such was the relationship between these parties on the 18th of July, 1933, when the brokers telegraphed the plaintiff as follows:

" Samuel Crowell, 1350 Broadway, New York, N. Y.

" Your account requires three hundred dollars additional margin immediately. If not received by 10:15 A. M. July 19, 1933, we shall at that time sell the securities in your account on New York Stock Exchange and New York Curb Market in accordance with their rules.

" COHEN, SIMONSON & CO."

The plaintiff received the telegram. He did not meet the call for margin. Nor did the brokers follow through — they did not sell at ten-fifteen in the morning. Instead, the brokers held the stock until the afternoon, when it was then sold, without further notice. In the interim (between ten-fifteen A. M. and one-forty-nine P. M.) the stock declined in price, resulting in a corresponding diminution in proceeds, amounting to $317, for which this action is now brought.

The plaintiff contends that he took the defendants' telegram at its face value; that he relied upon the announcement that they would sell; that acting (by relying) upon such announcement, he watched the market quotations at the time specified in the notice, and satisfied with the bid prices he did nothing — content that the defendants should sell as they had specifically advised him they would in their written call; that their notice misled the plaintiff and induced him to forego affirmative conduct which he otherwise would have taken; that as a matter of law the defendants should be estopped from questioning their liability for their acts of commission or omission, and answerable for the damages sustained.

The defendants not only dispute the facts, but deny liability. It is their claim that while as a matter of law they have the right to give notice, they have no responsibility to do so; that while they could sell the plaintiff's stock at any time they saw fit in their judgment with or without notice, they were not obligated to do either, and hence there being no duty on their part to give notice, or having given it to abide by it, there was no right on the plaintiff's part to rely on such acts, and upon this theory the defendants move for summary judgment.

The case of *Rubin* v. *Salomon* (136 Misc. 527) is submitted as an authority on all fours with the case at bar. However, one notes that the *Rubin* case was instituted on the theory of conversion, constituted of the claim that the broker by giving notice of sale had waived the right to thereafter sell without notice. That is not this case.

And an examination of the authorities cited in the *Rubin* case reveals further significant differences. Take the case of *Lynch* v. *Sammonds* (87 N. Y. Supp. 420). In that case the communication sent by the broker *failed to designate any specific time when or where the stock would be sold.* The learned court in that case stressed this feature, referring to the fact that *the letter allowed the brokers to hold the stock a reasonable time.*

In the case of *Granite Bank* v. *Richardson* (7 Metc. [48 Mass.] 407) there was simply the relationship of the pledgor and pledgee. It did not involve the relationship of principal and agent. And in its opinion the court there points out that the different relationship would spell a different obligation.

So also in the case of *Esser* v. *Linderman* (71 Penn. St. 76) the judges specifically comment that the brokers' letter " *called for an answer.*" For this reason the customer's inference that the brokers would sell if the customer did not answer was held unwarranted.

It further appears that the opinions from Dos Passos on Stock Brokers and Stock Exchange, cited by Mr. Justice ROSALSKY, as well as the references one finds in Meyers Law of Stock Brokers, look to the same authorities for support. But these citations, as indicated, do not squarely support the conclusions espoused.

There are certain fundamental and well-established principles of law applicable to the transactions between these parties. And except in so far as the special contract between the parties alters or amends these principles, they must play a controlling part in the determination of the respective rights and responsibilities of the parties.

As agents for the customer, the defendants, as brokers, were duty bound to carry out the instructions of the plaintiff. The fact that the brokers were also pledgees did not itself destroy the title of the plaintiff as the owner of the securities, nor in itself relieve the defendants of their duties as agents.

" A broker is but an agent, and is bound to follow the directions of his principal, or give notice that he declines to continue the agency." (*Galigher* v. *Jones*, 129 U. S. 193, at p. 198.) And until the transactions between the parties came to an end, the relationships between them remained practically intact.

" While the legal relation between broker and client is that of pledgor and pledgee, there exists likewise that other legal relation of principal and agent. And we fail to see why an agent, in the case of a purchase and sale of stocks, is not in the same position with respect to his principal as any other agent would be. True, he has an agency coupled with an interest; but this relation of agency when once created is not affected by the question whether the principal has or has not kept good his margin. *Until the transaction is finally closed* out *and a profit or loss* results, the *relationship* between *the parties* is *undisturbed.* If we are correct in this view, it would be an anomalous conclusion to hold that an agent, for his own supposed benefit *or profit, could violate the instructions of his principal, and if a gain resulted, have the benefit of it, and if a loss, charge it upon his principal.*" (*Zimmermann* v. *Heil*, 86 Hun, 114, at p. 117; affd., 156 N. Y. 703.) (Italics mine.)

And even as pledgees the brokers (in the absence of any specific agreement to the contrary) would still be duty bound to recognize the title of the customer (the pledgor) in any enforcement of the brokers' rights as pledgees, " because under the common law it is well settled that if property is pledged for the payment of a debt due at a certain time, and if such debt is not paid, the property so pledged may be sold upon notice given to the pledgor." (*Estes* v. *Perkins*, 137 App. Div. 367, at p. 369.)

"In the absence of evidence on that subject, we must assume that the defendants stand upon their common-law rights. ' *The object to be attained by giving the notice is to afford the debtor an opportunity to redeem, and to be present at the sale to see and know that it is fairly conducted and the property disposed of to the best advantage. Unless the notice given be such as shall accomplish this purpose, it is an illusion and of no possible utility*, because, if the creditor does no more than give the notice of his intention to sell, *without saying when or where, or in what manner, he deprives the debtor of a substantial right* which the notice is designed to secure.' " (*Small* v. *Housman*, 208 N. Y. 115, at p. 124.) (Italics mine.)

And the end to be served by requiring notice is not left to inference.

Does the fact that the stock is not ear-marked property entirely destroy the objects of notice? The law still requires that the stockbroker shall designate the time and place of the proposed sale of the customers' securities. Harmonizing the object of notice with the manner and method in which securities of this type are sold on the stock exchange, one does not expect the customer to go to the stock exchange at the time designated for the sale of his stocks. The customer's journey is to the ticker or to the customers' room where he can keep in touch with the market transactions, and then and there observing the quotation on his stock (not necessarily the identical stock held by him) determine what if any steps he shall take for his own protection.

And in the case now before the court this is the very course of conduct that the plaintiff claims he followed. He had received the defendants' telegram expressly announcing that if the demanded margin was not received, his stock would be sold on the 19th day of July, 1933, at ten-fifteen A. M. at the New York Stock Exchange. In the very wording of the telegram the defendants provided that the failure of the plaintiff to put up the additional margin would be tantamount to a consent, if not construed as an instruction to sell. *This telegram did not call for an answer. It was a call for margin. This telegram did not omit the time or place. It specifically provided both.*

The defendants declare their intent; the plaintiff had a right to rely upon it. It requires a logical and legal contortion, after the deed is done, to say that the defendants are not estopped from the inevitable consequences of their own voluntary conduct. Indeed, in the ordinary case, had the brokers after such notice taken action, it would have been the duty of the customer to duly file his dissent.

" In this case the defendant received due notice of the time and

place of the proposed sale coupled with demand for payment of a definite amount. *If he was dissatisfied therewith it was his duty to dissent."* (*Weir* v. *Dwyer*, 62 Misc. 7, at p. 13.) (Italics mine.)

Does the same reason that commands that the customer express his protest, construe his silence as an acquiescence?

In a situation of this type, the thought found elsewhere in the law of pledgor and pledgee seems appropriate: " There is a class of contracts, of which we think this is one, where the mere indulgence of the creditor by a promise to extend the time, *or by his conduct, will effect a change in the duties and obligations of the parties to each other as prescribed by the original agreement."* (*Toplitz* v. *Bauer*, 161 N. Y. 325, at p. 332.) (Italics mine.)

But the defendants would have the court abide by the rule of *Klapp* v. *Bache* (229 App. Div. 415; affd., without opinion, 255 N. Y. 550). Upon careful examination I do not regard that case as conclusive.

Aside from the fact that there is a substantial difference in the language of the agreement before that court and the contract now before us, it is important to note that in the *Klapp* case the notice given to the customer did not designate any specific time and place where the stock was to be sold, in the event of default in putting up additional margin. It merely advised the customer of *the method by which the sale was to be accomplished,* to wit, stop orders.

Nor did the *Klapp* case involve estoppel. In that case the plaintiff sought to recover for alleged conversion. He based his claim upon the proposition that by giving notice of sale the brokers had lost their right to subsequently sell without notice.

Yet one may borrow some reasoning quoted in that very decision: " The person sought to be estopped must do some act or make some admission with an intention of influencing the conduct of another, or that he had reason to believe would influence his conduct, and which act or admission is inconsistent with the claim he proposes now to make. The other party, too must have acted upon the strength of such admission or conduct." (*Klapp* v. *Bache*, 229 App. Div. 415, at p. 418.)

What better worded portrait of this controversy than that quotation can one present? The brokers had acted. The customer had relied upon it. The intention was plain.

At this time, therefore, it is the opinion of this court that, for the reasons set forth, the motion of the defendants should be denied.