GEORGE GORDON, Respondent, *v.* GEORGE R. ELDER, JR., and
Others, Copartners, Doing Business under the Firm Name and
Style of WARWICK & Co., Appellants.

First Department, February 11, 1938.

*Jas. Madison Blackwell* of counsel [*Blackwell Bros.*, attorneys],
for the appellants.

*J. Joseph Noble* of counsel [*Roy Leifflen* with him on the brief;
*Bigham, Englar, Jones & Houston*, attorneys], for the respondent.

UNTERMYER, J.   In May, 1929, the plaintiff opened a brokerage account with the defendants.   At the same time he signed a customers' agreement which, in the broadest terms, authorized the defendants to sell any securities in his account without previous notice, whenever they might deem the collateral to be insufficient. On October 29, 1929, the plaintiff's indebtedness to the defendants was $40,879.69, against which they held certain securities as collateral.

In telephone conversation on the morning of October twenty-ninth, Bickwit, a customers' man employed by the defendants, informed the plaintiff that the market had declined, that his account was undermargined and that it would be necessary that certain of his securities be sold.   The plaintiff replied: " I will leave that entirely to you.   Whatever you think ought to go overboard, go ahead and do it."   Accordingly, certain securities were sold, which, together with $1,000 paid by the plaintiff, reduced his indebtedness to $35,062.44.

The market continued to decline throughout that day.   In the afternoon the plaintiff was at the defendants' office and was informed by Bickwit that his account required further margin of about $10,000 or $15,000.   The plaintiff requested twenty-four hours in which to furnish such collateral.   The plaintiff and Bickwit testified that Clark, one of the defendants and a partner of the firm, agreed to this.   If so, then the customers' agreement executed in May, 1929, would furnish no defense to an action for damages resulting from sales within the period of time allowed.   (*Rosenthal* v. *Brown*, 247 N. Y. 479.)   Although Clark admitted that he had seen the plaintiff in the office on October twenty-ninth, he denied recollection of any conversation with him.

The plaintiff then succeeded in borrowing from his brother a quantity of bonds, which he brought to the defendants' office early on the morning of October thirtieth.   He found the defendants' office in a state of confusion and, notwithstanding his protest, the account was sold out (with the exception of 1,100 shares of Perryman Electric Company stock) on orders executed at the opening of the market.   The plaintiff testified that the bonds which he had brought to the office, wrapped in paper, were worth between $35,000 and $40,000.   However, he could not describe them otherwise than that they were railroad and industrial bonds.   The package, which is said to have contained these bonds, was not opened there and was taken by the plaintiff when he left, but testimony of their identity was given by the plaintiff's brother and by their attorney.

Later, on the same day, the plaintiff protested to Clark of the violation of the agreement made previously. Clark suggested that he write to the firm setting forth any grievance he might have. Accordingly, on November 2, 1929, the plaintiff wrote to the defendants, in part:

" I wish to submit my case for your consideration. I am quite content to trust to your sense of fair play in arriving at a conclusion. Although a discussion of the case with Mr. Clark has sobered my view of the situation I still believe that I am deserving of much consideration.  *  *  *

" I am fully cognizant of the fact that my account was somewhat weakly margined during the latter part of October. To rectify this condition I had shown my good intentions by delivering to you as additional collateral the following stocks on October 24th:

" 50 shares of New Jersey Zinc
50   "   "  Texas Corp.
100   "   "  Packard Motors.

" On October 29th I had shown further signs of my intentions by voluntarily selling fifty (50) shares of I. T. T. and fifty (50) shares of United Corp. On that same day I spoke to Mr. Clark advising him that I expected to cash in on my building and loan paid up certificates in the amount of $7,000 the following day. I would likewise have access to unlimited additional funds the following day and as a result of this statement secured promises from Mr. Clark that nothing further would be done in my account for at least 24 hours."

The plaintiff testified that this was followed by a conversation on November sixth with the defendant Clark, and by a subsequent conversation with the defendant Morriss. He testified that he then offered to accept reinstatement of his account but that this offer was refused, the defendants pointing out to him that this would not be to his advantage since the firm would profit by the difference in the prices obtained on October twenty-ninth and the lower prices which prevailed on November sixth. According to the plaintiff he nevertheless persisted in his demand that the account be reinstated. According to Clark, the plaintiff decided to " leave well enough alone " at that time. Bickwit, called as a witness for the plaintiff, testified that at the end of the conversation it " was just left that way."

Notwithstanding the alleged unauthorized transactions, the plaintiff continued to trade with the defendants. On November 4, 1929, there were 1,600 shares of Perryman Electric stock remaining in his account against a debit balance of $9,603.22, an additional

500 shares having been delivered by the plaintiff on October thirty-first. On November eighth the plaintiff bought 100 shares of Packard stock for $1,600. On November twelfth he paid $2,000 in reduction of his indebtedness. On November fourteenth he deposited an additional $8,000 in the account, sold 100 shares of the Perryman Electric stock for $900.50 and the 100 shares of Packard stock for $1,533.50. These transactions, after crediting the proceeds of the alleged wrongful sales, created a balance in the plaintiff's favor which, after deduction of an interest charge, amounted to $1,198.55.

On November fifteenth the defendants sent to the plaintiff a statement of the November transactions, which carried over a balance resulting from the transactions of October, together with a check for $1,198.55 and the remaining shares of Perryman Electric stock. The concluding words of the statement are, "Check to balance a/c $1,198.55." This check the plaintiff accepted and deposited without complaint concerning the statement or any notation thereon.

On December 6, 1929, the plaintiff delivered 500 shares of Perryman Electric stock to the defendants, which he caused to be delivered from the account on December twenty-third. About two months later he reopened an account with the defendants and continued to trade actively to April 24, 1931, when it was finally closed. He concedes that he made no protest during this period, nor until June 28, 1932, after the defendants had dissolved their partnership. Then, for the first time, he threatened suit unless his claim for loss, sustained by reason of the alleged unauthorized sales on October thirtieth, was adjusted.

This action for a conversion by the defendants of the plaintiff's securities followed. In its charge the court only submitted to the jury the question whether the defendants had agreed to the extension of time to furnish collateral, instructing the jury that if they so found, the verdict must be for the plaintiff. However, in compliance with the defendants' requests to charge, the court further submitted to the jury as an issue of fact the question whether the plaintiff by his conduct had ratified the alleged unauthorized transactions but declined to rule that he had done so as matter of law. By their verdict the jury decided, it may be assumed, that there was a special contract for an extension of time of twenty-four hours to furnish collateral, that that agreement was broken by the defendants and that the plaintiff did not ratify the sales.

We think there was a ratification in fact, if indeed there was not a ratification as matter of law. When the plaintiff learned of the unauthorized transactions, he had the right to repudiate or to

ratify them. (*Stiebel* v. *Lissberger*, 166 App. Div. 164; affd., 222 N. Y. 604.) But if he once recognized them as valid by word or conduct, he could not recede from that position and treat them as unauthorized. (*Craig* v. *Pierce*, 231 App. Div. 159; *Schmid* v. *DuVal*, 200 id. 514.) Whether he ratified the transactions here must be determined in the light of all the circumstances, including the fact that the market for his securities, which had risen slightly on October thirty-first, was continuously lower than the prices realized on the unauthorized sales. It is difficult to believe under these circumstances that the plaintiff, on November 6, 1929, should, as he testified, have persisted in demanding that the defendants reinstate his account with a profit to themselves. Far more probable is the testimony of Clark and of the plaintiff's witness Bickwit, that when this was demonstrated to the plaintiff, he concluded to allow the transactions to stand. His letter written previously contained no unequivocal repudiation of these sales, but professed to be merely an appeal to the defendants' " sense of fair play " coupled with a plea that he was " deserving of much consideration."

That which followed is even more significant in its relation to the issue of ratification, always remembering that security prices continued to decline. After November sixth the plaintiff continued to trade through the defendants by the purchase on November eighth and the sale on November fourteenth of 100 shares of Packard stock. On November fifteenth he received without objection a statement of that date which reflected all previous transactions, including those alleged to have been unauthorized, together with the check for $1,198.55, which would represent the exact amount to which the plaintiff was entitled only if effect is given to the alleged wrongful sales. When the plaintiff accepted this check he could not fail to know that he was receiving credit for the proceeds of the sale of the securities which he had contended should not have been sold. Yet he accepted the check without protest or complaint. That check closed the plaintiff's account with the defendants, but he delivered to them on December sixth a further 500 shares of Perryman Electric stock which he withdrew on December twenty-third. Two months later he renewed his trading operations with the defendants and continued trading for upwards of two years. We think the plaintiff's conduct is consistent only with an intention to ratify the transactions now complained of and that the verdict of the jury to the contrary is against the weight of the evidence. (Compare *Britton* v. *Scognamillo*, 238 N. Y. 375; *Gracey* v. *Campbell*, 260 id. 592; *Robinson* v. *Miller*, 210 App. Div. 450; *Jacobs* v. *Moore*, 195 id. 452; *Cohen* v. *Rothschild*, 182 id. 408; *Manning* v. *Heidelbach*, 153 id. 790; *Smith* v. *Hutton*, 138 id. 859; affd., 203 N. Y. 594; *Buck* v. *Houghtaling*, 110 App. Div. 52.)

The judgment should be reversed and a new trial ordered, with costs to the appellants to abide the event.

MARTIN, P. J., GLENNON, DORE and CALLAHAN, JJ., concur.

Judgment unanimously reversed and a new trial ordered, with costs to the appellants to abide the event.